**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**George WILLIAMS, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 2, 2012.

Filed Dec. 3, 2012.

Barnaby Wittels, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney and Suzan Wilcox, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., and ALLEN, J.

OPINION BY STEVENS, P.J.

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted Appellant George Williams of second-degree murder,[1] criminal conspiracy,[2] and a violation of the Uniform Firearms Act (VUFA).[3] Appellant challenges the trial court's discretion in making certain evidentiary rulings and claims the trial court's jury instructions were improper. We affirm.

Appellant was charged in connection with the shooting death of Derrick Ralston (hereinafter "the victim"). The victim's body was discovered in an alley in the vicinity of Bridge and Granite Streets in Philadelphia, near Cappy's Bar. At Appellant's trial, two witnesses, Marcos Vinzenni and John Joseph Miller, testified to the events that occurred immediately prior to the victim's murder. Both Vinzenni and Miller were standing on the porch of Cappy's Bar in the early morning hours of October 19, 2007, when they saw three black males shouting at one white male in the middle of the street. The black males ordered the white male to strip off his clothes and two of the black males were pointing guns at the white male. Both Vinzenni and Miller recognized two of the black males, who they only knew by their nicknames "Killa" and "Stacks." Vinzenni and Miller testified that Killa and Stacks were the two men pointing guns at the victim. Miller testified that he heard the white male say "[w]e can work this out. I can take care of this. You don't have to do this." N.T. Trial, 10/7/10, at 71.

Despite the white male's pleading, Killa, Stacks, and the other black male chased the naked white male down the street. Miller testified that approximately seven seconds later, he saw gun flashes and heard eight to nine gunshots. Miller reported that he saw the black males run back in front the bar, where he witnessed Killa pick up the white male's clothes from

---

1. 18 Pa.C.S.A. § 2502(b).

2. 18 Pa.C.S.A. § 903.

3. 18 Pa.C.S.A. § 6106(a)(1) ("Firearms not to be carried without a license").

the street and saw both Killa and Stacks holding guns. The three black men left the area. When Miller gave his statement to police, he identified Appellant as the man he knew as "Killa" from a photo array.

In another account, prosecution witness Vinzenni testified that he went back inside the bar after the black men chased the white male down the street. Vinzenni's friends followed him into the bar shortly thereafter and reported they heard gunshots. After making his statement to police, Vinzenni was shown photo arrays and also identified Appellant as the man he knew as "Killa."[4] As noted above, police discovered the naked body of a white male in an alley between Bridge and Granite Streets. The white male, who was identified as the victim, was lying on his side and had suffered multiple gunshot wounds to the head and chest.

The victim's wife, Lauren Ralston, testified that a friend had introduced her and the victim to "Killa" in 2005 or 2006. She did not know Appellant by any other name than Killa until after the death of her husband. The day before the victim was murdered, Lauren discovered that the victim owed Appellant money after listening to four or five messages that Appellant left on the victim's voicemail. In this last message, Appellant told the victim "don't worry about calling back because it's too late." N.T. Trial, 10/6/10, at 194. When Lauren questioned the victim about the messages, the victim admitted that he owed Killa money, but promised he would pay him back. The victim's cell phone records showed that Appellant had called him over 40 times that evening. Appearing nervous, the victim told Lauren that he was going out to get Killa some "weed," left the couple's home in Pottstown, and took Lauren's SUV to meet Appellant. N.T. Trial, 10/6/10, at 197. The victim never came home that evening.

After awaking in the early morning hours of October 19, 2007 and discovering the victim was not home, Lauren attempted to call Appellant to find out where the victim had gone. Appellant denied ever meeting the victim in Pottstown and denied knowing the victim's whereabouts. After the victim was gone for several hours, Lauren began desperately searching for him, driving around her hometown and calling local hospitals and the police to report his disappearance. Lauren called Appellant again to ask him to help her look for the victim and talk to the local police. Appellant again denied knowing the victim's whereabouts.

After Lauren told Pottstown detectives about "Killa," the Pottstown detectives contacted Appellant in order to speak with him about the victim's disappearance. Appellant arranged to meet Pottstown detectives near his home in Philadelphia. Before Pottstown detectives met with Appellant, they were notified that the victim's body had been found near Appellant's home. Appellant told Pottstown detectives that he had last seen the victim two or three days earlier. Shortly thereafter, Philadelphia detectives arrived to speak with Appellant and transported him to their headquarters.

Appellant gave the Philadelphia homicide detectives a different account, admitting that he was present when the victim was killed, but claimed to have no part in his murder. After learning the victim was struggling financially, Appellant set up a meeting so that the victim could sell drugs

---

4. Both Vinzenni and Stacks identified John Andrews as the man they knew by the name of "Stacks."

for "Raheem." When the victim did not pay Raheem for the drugs he sold, Appellant claimed that Raheem and Stacks threatened him at gunpoint and made him call the victim repeatedly to meet up with them in Pottstown. When they picked the victim up, Raheem and Stacks forced Appellant and the victim to go with them to Philadelphia, where they ordered both Appellant and the victim out of the car, ordered the victim to strip his clothes and shot the victim in a nearby alley. Appellant claims Raheem and Stacks forced him to go along with the abduction and warned him if he would "run his mouth" about the shooting, the same thing would happen to him. N.T. Trial, 10/7/10, at 177.

When the Philadelphia police told Appellant that his version of the shooting was not true, Appellant again changed his story. Appellant claimed the victim had told Raheem that he would "set up" three people who owed him money for drugs to repay the victim's debt to Raheem. On the evening of October 18, 2007, Raheem, Stacks, and Appellant went to the victim's home to execute this plan. The victim began to make excuses and claimed he wanted to be home with his wife as they were having problems. However, the victim reluctantly agreed to drive his vehicle to show Raheem where the alleged targets of their plan lived, but his vehicle ran out of gas.

Subsequently, Raheem and Stacks forced the victim to ride with them and drove him to Philadelphia. Appellant claimed he had nothing to do with their forced abduction of the victim. Appellant alleged that Raheem gave him a P–38 9–mm weapon before ordering the victim out of the car onto the Philadelphia Street and then shooting him moments later. When driving Raheem home, Appellant claims that he tried to return the gun to Raheem, but Raheem told him to hold it. Once Raheem discovered that the victim's wife was calling Appellant to find out where the victim had gone, Appellant contends that Raheem took the firearm from Appellant and told him not to tell the police what happened.

After the victim's body was discovered and the police executed a search warrant for Appellant's home, they did not find any firearms, but did find Appellant's cell phone, from which police recovered a photograph of Appellant holding a Walther P–38 pistol. At trial, the Commonwealth presented Police Officer Louis Grandizio as a ballistics expert. Officer Grandizio testified that all the casings recovered from the murder scene came from one single .380 automatic weapon. After observing the bullets themselves, Officer Grandizio opined that the bullets used to kill the victim were not fired from a Walther P–38, which is a .9 mm pistol.

Prior to trial, Appellant filed a motion *in limine* seeking *inter alia* to preclude the Commonwealth from referring to him by his nickname "Killa" and to prevent the admission of the photograph of Appellant holding a firearm. The trial court denied Appellant's motion *in limine*. Appellant proceeded to trial for the murder of victim Derrick Ralston, after which the jury found Appellant guilty of second-degree murder, conspiracy, and carrying a firearm without a license. The trial court sentenced Appellant to an aggregate sentence of life imprisonment without the possibility of parole. After Appellant's timely post-sentence motions were denied, this timely appeal followed.

Appellant raises the following issues for our review on appeal:

A. DID THE COURT BELOW ERR IN DENYING APPELLANT'S MOTION IN LIMINE AND THEREBY PERMIT EXTREMELY PREJUDICIAL AND NON–

PROBATIVE EVIDENCE TO BE PRESENTED TO THE JURY?

B. DID THE COURT BELOW ERR IN INSTRUCTING THE JURY ON THE CHARGES OF CONSPIRACY AND FELONY MURDER, THEREBY CONFUSING AND MISLEADING THE JURY AS TO THE LAW?

C. DID THE COURT BELOW ERR IN PERMITTING THE BALLISTICS EXPERT TO TESTIFY WHEN HE DID NOT CONDUCT THE BALLISTICS TEST THEREBY DENYING APPELLANT HIS RIGHT TO CONFRONTATION UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE PENNSYLVANIA CONSTITUTION?

Appellant's Brief, at 6.

Appellant claims the trial court erred in denying his motion *in limine* to preclude the Commonwealth from admitting certain evidence at trial. When reviewing a trial court's discretion to make evidentiary rulings, our standard of review is limited:

"The admissibility of evidence is a matter of trial court discretion and a ruling thereon will only be reversed upon a showing that the trial court abused that discretion." *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 775 (2004). An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Commonwealth v. Brougher*, 978 A.2d 373, 376 (Pa.Super.2009).

*Commonwealth v. Barnett*, 50 A.3d 176, 182 (Pa.Super.2012). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Fransen*, 42 A.3d 1100, 1106 (Pa.Super.2012). However, even relevant evidence "may be excluded if its probative value is outweighed by the potential prejudice." *Id.*

▮ First, Appellant claims the trial court abused its discretion in allowing the Commonwealth's witnesses and the prosecutor to refer to Appellant as "Killa." Appellant argues that the nickname, which the jury may have inferred meant "killer," was overly prejudicial. We disagree. Appellant's nickname was relevant as the witnesses who implicated Appellant in the victim's murder only knew him by the name Killa. Vinzenni and Miller told police that two men they knew as "Killa and Stacks" threatened the victim at gunpoint, made him strip in the middle of the street, and chased him in an alley where his body was later found. The victim's wife, Lauren, could only identify Appellant to police as Killa even though she had met Appellant several times prior to her husband's death and knew Appellant well enough to call him on his cell phone when the victim did not come home. Lauren did not know Appellant's real name until after her husband was murdered. Appellant concedes that he is known by his nickname, which he gave himself, telling police that "[p]eople call me Killa, that's my rap name." N.T. 10/7/10, at 164.

Our review of the record shows that the Commonwealth did not use Appellant's nickname to suggest Appellant had a violent character, but used it to show that the witnesses recognized Appellant and could identify him as one of the perpetrators even though the witnesses did not know Appellant's real name. Moreover, we find that the evidence's probative value in iden-

tifying Appellant outweighed any prejudice that resulted from the use of his nickname. Thus, the trial court did not abuse its discretion in allowing the Commonwealth to refer to Appellant by his nickname "Killa."

Second, Appellant claims that the trial court abused its discretion in allowing the Commonwealth to admit the photograph they discovered on Appellant's phone, which showed Appellant posing with a Walther P–38 9–mm pistol. The Commonwealth's ballistics expert, upon examining the bullets and casings found at the crime scene, determined that the victim was not killed with a Walther P–38, but more likely, a .380 semi-automatic weapon. As a result, Appellant argues it was overly prejudicial to show the picture of Appellant with a weapon that was not used to murder the victim.

■ Although as a general rule, the Commonwealth may not admit evidence of a weapon that cannot be linked to the crime charged, an exception exists where "the accused had a weapon or instrument suitable to the commission of the crime charged." *Commonwealth v. Owens*, 929 A.2d 1187, 1191 (Pa.Super.2007) (quoting *Commonwealth v. Edwards*, 762 A.2d 382, 386 (Pa.Super.2000)).

A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime.

*Owens*, 929 A.2d at 1191 (quoting *Commonwealth v. Broaster*, 863 A.2d 588, 592 (Pa.Super.2004)). "Uncertainty whether the weapons evidence was actually used in the crime goes to the weight of such evidence, not its admissibility." *Owens*, 929

A.2d at 1191 (citing *Commonwealth v. Williams*, 537 Pa. 1, 20, 640 A.2d 1251, 1260 (1994) (citation omitted)). In *Owens*, this Court found that a trial court properly admitted evidence of handgun ammunition found in the defendant's car and home during the prosecution of Appellant for a drive-by shooting as such evidence was relevant as tending to prove that the defendants had weapons similar to the ones used in the perpetration of the crime. *Owens*, 929 A.2d at 1191.

■ In this case, the photograph of Appellant proudly displaying a P–38 Walther nearly five days before the murder was relevant to show that Appellant had possession and control of a weapon similar to the one used to commit his crimes. Appellant claims that Raheem gave the P–38 Walther firearm to him "to hold" immediately before the shooting. Admission of the photograph challenges Appellant's claim that this firearm did not belong to him and shows Appellant had access to a firearm similar to the one witnesses claimed he was holding when threatening the victim on the night of the murder. As the probative value of this evidence outweighed any resulting prejudice, the trial court did not abuse its discretion in admitting this photograph into evidence. *See Fransen*, 42 A.3d at 1106.

■ In his last two claims, Appellant argues that the trial court's jury instructions on conspiracy and felony murder were confusing and misleading and contends that the trial court erred in allowing the ballistics expert to testify. However, these issues are waived as Appellant never made these objections to the jury instructions or the ballistic expert's testimony during trial. Our rules of appellate procedure provide that "[i]ssues not raised in the lower court are waived and cannot be

raised for the first time on appeal." Pa. R.A.P. 302.

For the foregoing reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.