**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**Jacob Matthew CHRISTINE, Appellant.**

Superior Court of Pennsylvania.

Argued April 9, 2013.
Filed Aug. 30, 2013.

Brian C. Laswer, Easton, for appellant.

Patricia F. Mulqueen, Assistant District Attorney, Easton, for Commonwealth, appellee.

BEFORE: STEVENS, P.J.,* FORD ELLIOTT, P.J.E., BOWES, J., GANTMAN, J., PANELLA, J., SHOGAN, J., LAZARUS, J., MUNDY, J., and OTT, J.

## ORDER

PER CURIAM.

The Court, being evenly divided, the Order of the Court of Common Pleas is affirmed.

OPINION IN SUPPORT OF AFFIRMANCE BY MUNDY, J., BOWES, J. and SHOGAN, J. join.

GANTMAN, J. concurs in the result.

OPINION IN SUPPORT OF REVERSAL BY OTT, J., FORD ELLIOTT, P.J.E., PANELLA, J. and LAZARUS, J. join.

STEVENS, P.J. did not participate in the consideration or decision of this case.

* President Judge Stevens did not participate in　the consideration or decision of this case.

OPINION IN SUPPORT OF
AFFIRMANCE BY MUNDY, J.:

Appellant, Jacob Matthew Christine, appeals from the November 24, 2010 aggregate judgment of sentence of nine to 20 years' imprisonment imposed after a jury found him guilty of aggravated assault and recklessly endangering another person (REAP).[1] After careful review, we would affirm.

The trial court summarized the underlying facts of this case as follows.

The convictions resulted from an incident that occurred in Northhampton County Prison (NCP) on June 8, 2009. On that date, [Appellant] and the victim, Thomas Missero, were inmates in NCP when a confrontation between the two men occurred in [Appellant]'s cell in Unit B–2. The cell housed 8 inmates in four rows of bunk beds. While in [Appellant]'s cell, [Appellant] was alleged to have slashed Mr. Missero's neck and ear with a razor blade. Immediately after the attack, corrections officers searched [Appellant]'s cell. Only one weapon, a shank, was found in the cell. It was hidden within [Appellant]'s bed.

Interestingly, [Appellant] testified at trial that the victim came into his cell armed with a razor blade and attacked [Appellant]. [Appellant] claimed that he successfully disarmed the victim, picked up the razor from the floor and then unintentionally sliced the victim when the victim continued to threaten [Appellant]. Even though [Appellant] was the last person to have control of the weapon, it has never been located. [The trial court] also note[d] that there were no injuries suffered by [Appellant].

Trial Court Opinion, 4/26/11, at 1–2.

On July 14, 2009, the Commonwealth charged Appellant with attempted criminal homicide[2], aggravated assault and REAP. Appellant proceeded to a three-day jury trial. On October 7, 2010, the jury found Appellant guilty of aggravated assault and REAP, but found him not guilty of attempted criminal homicide. On November 24, 2010, the trial court imposed an aggregate sentence of nine to 20 years' imprisonment.[3] On December 6, 2010, Appellant filed a timely post-sentence motion.[4] Appellant's post-sentence motion was denied on April 26, 2011. On May 5, 2011, Appellant filed a timely notice of appeal.[5]

On April 24, 2012, a divided panel of this Court vacated Appellant's judgment of sentence and remanded the case for a new trial, concluding that the trial court abused its discretion in not permitting Appellant to introduce evidence of Missero's subsequent criminal convictions. On May 21, 2012, the Commonwealth filed a petition

---

1. 18 Pa.C.S.A. §§ 2702(a)(1) and 2705, respectively.

2. 18 Pa.C.S.A. § 901(a) (to commit 18 Pa. C.S.A. § 2501(a)).

3. The trial court sentenced Appellant to nine to 20 years' imprisonment for the aggravated assault charge and a concurrent term of one to two years' imprisonment for REAP. The aggregate sentence was to run consecutively to the prison term Appellant was already serving for unrelated offenses.

4. We note the final day for Appellant to timely file his post-sentence motion was December 4, 2010, which fell on a Saturday. *See* Pa.

R.Crim.P. 720(A)(1) (stating that "a written post-sentence motion shall be filed no later than 10 days after imposition of sentence[ ]"). When computing a filing period "[if] the last day of any such period shall fall on Saturday or Sunday ... such day shall be omitted from the computation." 1 Pa.C.S.A. § 1908. Therefore, Appellant's deadline to file a timely post-sentence motion was Monday, December 6, 2010.

5. Appellant and the trial court have complied with Pa.R.A.P. 1925.

for reargument *en banc*. This Court granted the Commonwealth's petition on July 10, 2012, and the previous panel memorandum was withdrawn.

In his substituted brief on reargument, Appellant raises three issues for our review.

1. Did the trial court abuse its discretion when it refused to allow Appellant to present testimony at trial regarding a criminal assault in the alleged victim's criminal record?

2. Did the trial court abuse its discretion when it permitted the Commonwealth to introduce a "shank" as physical evidence as well as testimony regarding said shank in the course of the jury trial in the instant matter?

3. Was the sentence imposed contrary to the norms which underlie the sentencing process and does this case involve circumstances where the application of the sentencing guidelines was clearly unreasonable?

Appellant's Brief at 4.

■ In Appellant's first two issues on appeal, he challenges the trial court's rulings regarding the admission of evidence at trial. We begin by noting our well-settled standard of review over such matters.

Admission of evidence … rests within the sound discretion of the trial court, which must balance evidentiary value against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury. We reaffirm our confidence in our trial judges to oversee the presentation of evidence so that overtly passionate, intentionally biased and inflammatory material is kept out of the courtroom. We will reverse a trial court's decision as to admissibility of evidence only if [Appellant] sustains the heavy burden to show that the trial court has abused its discretion.

*Commonwealth v. Bryant*, —— Pa. ——, 67 A.3d 716, 726 (2013) (citations and internal quotation marks omitted).

■ First, Appellant avers that the trial court erred in precluding him from "questioning Missero regarding [a] simple assault charge" which "Missero had plead [sic] guilty to, and was sentenced for." Appellant's Brief at 9. Appellant further argues that "[t]his cross examination would have substantially proven the 'alleged violent propensities' of the victim to show that the victim was in fact the aggressor." *Id.* at 10–11, *quoting Commonwealth v. Carbone*, 707 A.2d 1145, 1154 (Pa.Super.1998), *appeal discontinued*, 556 Pa. 685, 727 A.2d 1116 (1998). The Commonwealth counters, and the trial court concluded, that "[a] subsequent act of violence cannot be considered an indicator of someone's propensity for violence in the past." Commonwealth's Brief at 16; *see also* Trial Court Opinion, 4/26/11, at 13 (stating, "[a] subsequent conviction arising from events that transpired after the incident involving [Appellant] simply has no bearing on whether Missero [sic] possessed violent propensities on June 8, 2009[ ]") (footnote omitted).

Our Supreme Court has held that "as far back as 1884, [Pennsylvania courts have] permitted the introduction of character evidence to prove the decedent's violent propensities, where self-defense is asserted and where there is an issue as to who was the aggressor." *Commonwealth v. Dillon*, 528 Pa. 417, 598 A.2d 963, 965 (1991), *citing Alexander v. Commonwealth*, 105 Pa. 1, 9 (1884). Further, our Supreme Court has specifically held that the victim's criminal record can be admissible on two distinct grounds.

(1) to corroborate [the defendant's] alleged knowledge of the victim's quarrelsome and violent character to show that the defendant reasonably believed that his life was in danger; or (2) to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor.

. . .

▮ Nor do we mean to suggest that our decision here abandons the rule enunciated [sic] in [*Abernethy v. Commonwealth*, 101 Pa. 322 (1882) ] that the defendant must first establish a foundation of his knowledge of the victim's convictions before he can introduce the corroboratory record when the defendant is seeking to prove his belief that he was in imminent danger of bodily harm. Here again, the determination whether or not the defendant demonstrates a sufficiently particular knowledge of the victim's record rests within the sound discretion of the trial court.

*Commonwealth v. Amos*, 445 Pa. 297, 303, 305, 284 A.2d 748 (1971). We highlight that our Supreme Court held that a defendant must lay a foundation for his knowledge of the victim's convictions only when he "is seeking to prove his belief that he was in imminent danger of bodily harm." *Id.* at 305, 284 A.2d 748. It therefore logically follows that a defendant need not establish knowledge of the victim's record in order "to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor." *Id.* at 303, 284 A.2d 748. In every case, the defendant is also required to show that the convictions sought to be introduced "are similar in nature and not too distant in time" from the underlying incident. *Commonwealth v. Mouzon*, 617 Pa. 527, 53 A.3d 738, 741 (2012). Because Appellant wished to use Missero's subsequent conviction to establish the second *Amos* ground

as opposed to the first, Appellant was not required to show specific knowledge of the conviction. *See Amos, supra* at 303, 305, 284 A.2d 748.

Applying *Amos* to the case *sub judice,* we conclude the trial court did not abuse its discretion. The facts stemming from Missero's subsequent conviction were as follows.

[Defense Counsel]: May 1st of 2010, Nazareth Police were called to the American Hotel in Nazareth for a report of an assault. Thomas Missero was outside and his girlfriend was there, Melissa Miller. She claimed that [Missero] had grabbed her and pushed her. She had minor damage to her ear as a result of falling, I guess, from the push, and that he had threatened her.

N.T., 10/5/10, at 27. As a result, Missero pled guilty to simple assault and REAP. *Id.* at 27–28. The trial court concluded that Missero's subsequent convictions "[do not] really demonstrate violent propensities." *Id.* at 29. We agree. In our view, this offense is not "similar in nature" to the events that Appellant alleged transpired on June 8, 2009. *Mouzon, supra; see also* N.T., 10/6/10, at 45–47 (stating that Missero threw a hot cup of coffee on Appellant and punched him multiple times). As a result, we conclude that the trial court did not abuse its discretion in excluding evidence regarding Missero's subsequent convictions. *See Bryant, supra.* As a result, Appellant's first claim fails.

▮ In his second issue, Appellant avers that the trial court abused its discretion in denying his motion *in limine* to preclude the Commonwealth from introducing the shank found in Appellant's bed and testimony regarding it. Appellant's Brief at 13. Appellant argues that the shank should have been excluded given the Commonwealth's concession that the shank was

not the weapon used in the underlying incident. *Id.* The Commonwealth counters that the shank was relevant to show "that [Appellant] had a weapon similar to the one used in the perpetration of the crime." Commonwealth's Reply Brief at 9.

Pennsylvania Rule of Evidence 401 addresses relevancy and provides as follows.

**Rule 401. Test for Relevant Evidence**

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Pa.R.E. 401; *see also* Pa.R.E. 402 (stating, "[a]ll relevant evidence is admissible, except as otherwise provided by law … [but e]vidence that is not relevant is not admissible[ ]"). In Pennsylvania, a weapon that "cannot be specifically linked to a crime" is generally inadmissible at trial. *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 351 (1998), *cert. denied, Robinson v. Pennsylvania*, 528 U.S. 1082, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000). However, this Court has consistently noted an exception to this rule.

A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime.

*Commonwealth v. Williams*, 58 A.3d 796, 801 (Pa.Super.2012), *quoting Commonwealth v. Owens*, 929 A.2d 1187, 1191 (Pa.Super.2007), *appeal denied*, 596 Pa. 705, 940 A.2d 364 (2007).

In *Williams*, the appellant was charged and convicted of second-degree murder stemming from a shooting that began outside a bar in Philadelphia. *Id.* at 797. As part of its case, the Commonwealth introduced into evidence a "photograph they discovered on [the a]ppellant's phone, which showed [the a]ppellant posing with a Walther P–38 9–mm pistol." *Id.* at 801. The photograph was admitted despite the fact that the Commonwealth's ballistics expert testified "upon examining the bullets and casings found at the crime scene, [the Commonwealth's expert] determined that the victim was not killed with a Walther P–38, but more likely, a .380 semi-automatic weapon." *Id.* On appeal, this Court upheld the admission of the photograph, even though the Commonwealth did not believe the gun in the photograph was the murder weapon.

In this case, the photograph of Appellant proudly displaying a P–38 Walther nearly five days before the murder was relevant to show that Appellant had possession and control of a weapon similar to the one used to commit his crimes. Appellant claims that [a friend] gave the P–38 Walther firearm to him "to hold" immediately before the shooting. Admission of the photograph challenges Appellant's claim that this firearm did not belong to him and shows Appellant had access to a firearm similar to the one witnesses claimed he was holding when threatening the victim on the night of the murder.

*Id.* As a result, we concluded that the trial court did not abuse its discretion in admitting the photograph. *Id.*

In this case, Thomas Missero, the victim, testified about the weapon used to attack him, and claimed that it was not his weapon.

Q: Did you see anything in [Appellant]'s hand?

A: I didn't see nothing in his hand until afterward, I realized I was cut, and it

was a modified razorblade lying on the ground covered in blood.

Q: You saw the razorblade on the ground in blood?

A: Yes, I did.

Q: Can you describe that for the jury, please?

A: It was a razor made out of like a regular normal Bic Razor that you get from the dollar store, they issue them in the prison. The blade was taken out, and at the end it had paper or tape wrapped around it with the blade sticking out maybe an inch.

Q: How long was the taped part you saw?

A: Just the taped part was about 2 inches.

Q: And that was attached to the razorblade itself?

A: Yes.

Q: And you only saw this on the ground?

A: Yes.

**Q: Did you have a razorblade on you?**

**A: No, I did not.**

N.T., 10/5/10, at 63–64 (emphasis added).

However, Appellant presented a different version of events. At the outset, in her opening statement, defense counsel argued to the jury that Appellant acted in self-defense and claimed that it was actually Missero that had the razorblade and brought it into the cell. *See id.* at 51 (stating to the jury that Appellant "was minding his own business when Thomas Missero came into his cell, there's a hot cup of coffee thrown on him, punches go, and then he sees a razorblade coming at him, and Tom Missero takes a slice at him, doesn't hit him[ ]"). Appellant later testified in his own defense as to his version of events.

Q: What happened [when you tried to exit the cell]?

A: I never actually made it outside of the cell. When I saw [Missero], he made eye contact with me, I noticed he had a hot cup of coffee in his hand, a steaming hot cup of coffee. I don't know what was in his other hand, **I don't know if he had a razor in his hand or concealed some other place in his body.**

. . .

Q: Was [Missero] saying anything to you?

A: He didn't say anything to me. As soon as he saw me, he ran towards me, I took some steps back into the cell, retreating, wondering if he was actually going to enter the cell and attack me. He did. He ran into the cell, he threw the whole cup of coffee at me, luckily he missed me with that, because that probably might have blinded me and I would have really got hurt then. We kind of engaged in a scuffle. I'm scared. I know he means business. I know he's trying to hurt me. I'm afraid for my life. We exchanged some punches, we exchanged some blows. I kind of covered my face . . . to protect myself. When I brought my hands down, **I noticed he had a razorblade in his hand and took a swipe at me.** We were probably like in the middle area of the cell by now. I kicked him. Luckily, he fell and dropped the razorblade. I saw the razorblade, like at his side, I got him to the ground and pulled him away from the blade. I ran out and I picked it up. **But he had brought the razorblade—** he had brought a hot cup of coffee and it was his intention to throw the hot cup of coffee at me, blind me and cut me.

N.T., 10/6/10, at 45–47 (emphases added).

The Commonwealth provided the testimony of Corrections Officer Nathan Pi-

cone. Officer Picone testified that he helped search Appellant's cell immediately after the incident and discovered the shank in question.

Q: What did you do once you got to [Appellant's cell]?

A: Once we noticed all of the bloody towels and blood splattering in the cell, we then took the inmates housed in cell 3 and split them up. We split them up in different rooms around the block. The lieutenant then went and talked to each one individually.

Q: Would that be Lieutenant Lamont?

A: That would be Lieutenant Lamont. I, myself, and a few other officers then proceeded to shake down cell number 3.

Q: And did you find anything?

A: Yes, I did. . . . I personally found in what was later identified as [Appellant]'s bed, there was a small rip in the plastic cover of the bed. I ripped it open and I found a large metal object . . . with a sharp point and a handle wrapped around it, which is a piece of cloth wrapped real tight so they can have a grip on it. We identified that as a shank.

Q: . . . [F]or the record, could you say how long [the shank] was?

A: 18 to 20 inches.

. . .

Q: . . . [W]ere you able to determine how [Appellant] got th[e] metal rod [used in the shank]?

A: Yes, there was a metal bookcase in the, I forget the name of the room. They have a room where they do church services or when they want to watch movies on T.V.

Q: Is that the multipurpose room?

A: That would be the multipurpose room. In that room there is a bookcase, you know several stacks of books on it,

that rod was, in particular, one of the many rods that the books go on.
*Id.* at 37–40.

Appellant avers that the shank and testimony surrounding it were irrelevant and inadmissible because the Commonwealth "specifically indicate[d] . . . to [the trial court] on the record that '[i]t was not the weapon used in this incident.' " Appellant's Brief at 15, *quoting* N.T., 10/5/10, at 12. While the shank was not the weapon used in this case, it does not automatically follow that the shank was not relevant. The Commonwealth avers that although the razor in the fight and the shank had different blade lengths, the two weapons were nevertheless similar. Commonwealth's Reply Brief at 9. Specifically, the Commonwealth argues that "both the razor and the shank had cloth or tape at the end of the instrument in order to have a handle on it." *Id.* Indeed, the testimony at trial does reveal this distinctive characteristic of both weapons. *Compare* N.T., 10/5/10, at 63 (Missero stating, "[the razor] blade . . . at the end it **had paper or tape wrapped around it** . . ."), *with* N.T., 10/6/10, at 37 (Officer Picone describing the shank as "a sharp point and [having] a handle wrapped around it, which is **a piece of cloth wrapped real tight** so they can have a grip on it[ ]") (emphases added).

In our view, the distinctive manner in which Appellant created handles on both weapons for easy gripping makes the shank "a weapon similar to the one used in the perpetration of the crime," which is what our cases require. *Williams, supra.* We note that Missero did testify that razor blades were issued to inmates at the prison. *See* N.T., 10/5/10, at 65. While a generic razor blade, the main component of the weapon in this case, is not unique, it is the **intentional and specific modification** of the razor and the bookcase's metal rod into makeshift weapons, that makes

both of them distinctive. *See id.* at 64; N.T., 10/6/10, at 39–40.

Additionally, as noted above, Appellant's theory of the case was that the razorblade was not his weapon, but rather was Missero's weapon. *See* N.T., 10/6/10, at 46. Therefore, the possession of the razorblade was also at issue in the trial.[6] The shank therefore "tend[ed] to make [the] fact more ... probable" that Appellant "had the ability to fashion a homemade weapon from objects in the prison." Pa.R.E. 401; Trial Court Opinion, 4/26/11, at 7. The fact that the Commonwealth and Appellant agree that the shank was not the weapon used to attack Missero does not suddenly render the shank nonprobative. *See Williams, supra; Commonwealth v. Kubis,* 978 A.2d 391, 395 (Pa.Super.2009) (concluding that knives found in the appellant's car were relevant at trial for robbery to show that the appellant was more likely to have threatened to stab the victim even though "no knife was physically produced during the robbery"); *Commonwealth v. Broaster,* 863 A.2d 588, 591, 592 (Pa.Super.2004) (permitting admission of a discarded handgun into evidence to show that the appellant "readily obtained handguns of the same caliber used in the murder" even though the "Commonwealth conceded at trial that the discarded gun was not the murder weapon"), *appeal denied,* 583 Pa. 667, 876 A.2d 392 (2005).

Based on the aforementioned considerations, we conclude that the shank was relevant and admissible at trial. We further agree with the trial court that the probative value of the shank was not outweighed by its prejudicial effect. *See* Trial Court Opinion, 4/26/11, at 8; Pa.R.E. 403. As a result, the trial court did not abuse its discretion by allowing the Commonwealth to introduce it into evidence. *See Bryant, supra.* Therefore, Appellant is not entitled to relief on this issue.

■ In his final issue, Appellant avers that the sentence imposed by the trial court was "manifestly excessive" and unreasonable. Appellant's Brief at 18. Our standard of review in assessing whether a trial court has erred in fashioning a sentence is well settled.

[T]he proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion. [A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exer-

---

6. Although Appellant relies on our Supreme Court's decision in *Robinson,* we find that case to be distinguishable. In *Robinson,* the Commonwealth introduced a Bulldog 44 SPL revolver even though "there was never any doubt that the murder weapon was a 9 millimeter gun." *Robinson, supra* at 352. The trial court concluded that the revolver was relevant "in order to support the testimony that appellant was carrying the gun in his waistband at the time of the murder." *Id.* Our Supreme Court disagreed and concluded that the revolver did not tend to establish any material fact in the case.

[T]here was never any doubt that the murder weapon was a 9 millimeter gun, thus the introduction of the .44 was not relevant to the inquiry of whether the appellant had a weapon or implement suitable to commit the instant crime. In addition, Tara Hodge testified that appellant pulled a gun out of his sweats and shot her; and that the gun that appellant used was black and silver. This testimony was not disputed. We fail to see how testimony regarding where appellant had the gun on his person was of any value to the instant inquiry.

*Id.* However, in this case, there **was** a factual dispute as to whether or not Appellant had the razorblade on his person. *See* N.T., 10/5/10, at 64; N.T., 10/6/10, at 46–47. Therefore, testimony regarding Appellant's possession of similar makeshift weapons was certainly of "value to the instant inquiry." *Robinson, supra* at 352.

cised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will. ... An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Provenzano*, 50 A.3d 148, 154 (Pa.Super.2012) (citation omitted). We observe that Appellant does not challenge the legality of his sentence, but rather his argument goes to the discretionary aspects of his sentence. Appeals regarding the discretionary aspects of sentencing are not reviewable as a matter of right. *Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa.Super.2010) (citation omitted), appeal denied, 609 Pa. 685, 14 A.3d 825 (2011). In order for this Court to review the discretionary aspects of his sentence, Appellant must comply with the following.

[W]e must ... determine: (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

*Commonwealth v. Carrillo–Diaz*, 64 A.3d 722, 725 (Pa.Super.2013) (citation omitted).

Instantly, Appellant has filed a timely notice of appeal, as well as a timely post-sentence motion, and Appellant has included a Rule 2119(f) statement in his brief. Therefore, the only remaining issue before we may address the merits of Appellant's claim is whether he has raised a substantial question for our review.

"A substantial question will be found where the defendant advances a colorable argument that the sentence imposed is either inconsistent with a specific provision of the [sentencing] code or is contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Booze*, 953 A.2d 1263, 1278 (Pa.Super.2008) (citation omitted), *appeal denied*, 608 Pa. 659, 13 A.3d 474 (2010); *see also* 42 Pa. C.S.A. § 9781(b). "We determine whether a particular case raises a substantial question on a case-by-case basis." *Commonwealth v. Corley*, 31 A.3d 293, 297 (Pa.Super.2011) (citation omitted). "Additionally, we cannot look beyond the statement of questions presented and the prefatory 2119(f) statement to determine whether a substantial question exists." *Provenzano, supra.*

In his Rule 2119(f) statement, Appellant raises the following issue.

Under the circumstances of the instant matter, specifically that a dispute arose in the prison between inmates, that there is significant disagreement as to the circumstances under which the alleged assault occurred, along with numerous other factors, the sentence in the instant matter is manifestly unreasonable and creates a substantial question as to the appropriateness of the sentence imposed to warrant [a]ppellate review.

Appellant's Brief at 8. We note that a generic claim that a sentence is excessive does not raise a substantial question for our review. *See Commonwealth v. Harvard*, 64 A.3d 690, 701 (Pa.Super.2013) (stating, "a bald assertion that a sentence is excessive does not by itself raise a substantial question justifying this Court's review of the merits of the underlying claim[ ]"). Additionally, this Court has repeatedly held that an allegation that the trial court failed to consider particular cir-

cumstances or factors in an appellant's case go to the weight accorded to various sentencing factors and do not raise a substantial question. *Commonwealth v. Griffin*, 65 A.3d 932, 936 (Pa.Super.2013); *accord Commonwealth v. Cannon*, 954 A.2d 1222, 1228–1229 (Pa.Super.2008). Therefore, Appellant has not raised a substantial question for our review. *See Carrillo-Diaz, supra.*

Based on the foregoing, we conclude that the trial court did not abuse its discretion in admitting the shank found in Appellant's bed, nor in refusing to permit evidence regarding Missero's subsequent conviction. We further conclude that Appellant is not entitled to appellate review of his discretionary aspects of sentence claim. Accordingly, we would affirm the November 24, 2010 judgment of sentence.

## OPINION IN SUPPORT OF REVERSAL BY OTT, J.

Although I agree that the trial court properly precluded cross examination questioning of the victim, Thomas Missero, regarding his simple assault conviction, I write separately to express my view that the conviction was not relevant because the conviction and underlying conduct occurred subsequent to the prison incident. Furthermore, I cannot agree that the trial court properly allowed the shank found in Christine's bed into evidence, where there was no dispute that a razor blade was used in the incident and there was evidence that razors were readily available in the prison.[1]

In *Commonwealth v. Amos*, 445 Pa. 297, 284 A.2d 748 (Pa.1971), the Pennsylvania Supreme Court held that when self-defense is properly at issue, the victim's record is admissible "either (1) to corroborate [the defendant's] alleged knowledge of the victim's quarrelsome and violent character to show that the defendant reasonably believed that his life was in danger; or (2) to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor." *Id.* at 751 (footnote omitted). However, whereas *Amos* involved evidence of the decedent's **prior** aggressive behavior, at issue in this case is the victim's, Missero's, **subsequent** simple assault conviction for **post-incident** conduct.

I am of the view that a subsequent conviction for post-incident conduct that is offered to prove the character of a victim is irrelevant, since the conviction does not establish either of the two grounds set forth in *Amos, supra.*

As discussed, Missero's June 24, 2010 simple assault conviction resulted from an incident, occurring on May 1, 2010, in which Missero grabbed and pushed his girlfriend outside of a hotel, and she sustained minor injuries. Since the conviction and underlying offense occurred after the June 8, 2009 prison incident, there would be no basis for Christine to have knowledge of Missero's aggressive behavior. Moreover, Missero's conviction does not show a propensity for violence on June 8, 2009, because Missero's May 1, 2010 conduct was a future event.

In my view, the only relevant time period for purposes of proving a victim's, in this case, Missero's, character is the time period up until the occurrence of the confrontation. Therefore, I would affirm the trial court's ruling on the basis that Missero's subsequent conviction for an event that transpired after the prison incident should not be used "to **retroactively** estab-

---

1. Based on my view that the trial court erred in admitting the shank and a new trial is therefore warranted, I do not address Christine's discretionary aspects of sentencing claim.

lish [his] character" at the time of the incident. Trial Court Opinion, 4/26/2011, at 13.

Turning to the second issue, Christine's claim that the trial court improperly allowed introduction of the shank into evidence, I note that Pennsylvania Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "Evidence that is not relevant is not admissible." Pa.R.E. 402. It merits emphasis that in this case the Commonwealth conceded that the shank was not the weapon used to injure Missero.[2]

In *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344 (Pa.1998), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000), the Pennsylvania Supreme Court addressed the issue of the admissibility of a weapon that is not the weapon used in the crime, explaining:

> The general rule is that where a weapon cannot be specifically linked to a crime, such weapon is not admissible as evidence. However, there is an exception to this general rule where the accused had a weapon or implement suitable to the commission of the crime charged. [This weapon] is always a proper ingredient of the case for the prosecution.

*Id.*, 721 A.2d at 351 (quotations and citations omitted). The *Robinson* Court determined that the exception allowing the admission of a weapon of the accused "suitable to the commission of the crime charged" did not apply where the admitted evidence consisted of photographs of the defendant holding a gun that "in no way was implicated as the possible murder weapon." *Id.* at 351. *Robinson* also found that a .44 caliber revolver was not relevant, as the murder weapon was a 9 millimeter gun. *Id.* at 352.

Later, in *Commonwealth v. Marshall*, 743 A.2d 489 (Pa.Super.1999), *appeal denied*, 563 Pa. 613, 757 A.2d 930 (Pa.2000), a panel of this Court considered the admissibility of a weapon that had been in police custody at the time of the crime, and could not have been the weapon the defendant used in the crime. The *Marshall* Court stated: "Herein, appellant's gun was possessed by the police at the time of the homicide. Therefore, it was not relevant to show that appellant possessed the means to commit the murder. Moreover, the gun was clearly prejudicial since it was the same caliber as the murder weapon." *Id.*, 743 A.2d at 493.

In the present case, the shank introduced into evidence at trial was a "large metal object ... with a sharp point and a handle wrapped around it, which [was] a piece of cloth[.]" N.T., 10/6/2010, at 38. It was approximately "18 to 20 inches" long.[3]

---

**2.** *See* N.T., 10/5/2010, 45–46 (Commonwealth's opening statement) ("The defendant's cell was searched right after the incident. They did not find the razor that caused this incident or caused the slicing, what they did find was another instrument that had been fashioned by the defendant."). *See also, id.* at 12 (in-chambers discussion regarding Christine's motion *in limine* ) ("THE COURT: ... Was there a shank that was recovered that was alleged to be the weapon in this incident? [COMMONWEALTH'S ATTORNEY]: It was not the weapon used in this

incident ... We believe a razorblade was used, no razorblade was found. Right after the incident they searched [Christine's] cell, what they found was a shank. The Commonwealth intends to introduce the shank even though we do not believe that that is the instrument that was used.").

**3.** The metal rod used to fashion the shank was taken from a metal bookcase in a common room of the prison. N.T., 10/6/2010, at 39.

*Id.* However, both Christine and Missero testified that the weapon involved in the confrontation was a razor blade. Missero testified that when he realized he was cut, he saw "a modified razor blade laying on the ground covered in blood." N.T., 10/5/2010 at 63–64. He described the weapon that caused his injuries as "a razor made out of like a[ ] normal Bic Razor that you get from the [D]ollar [S]tore, they issue them in prison. The blade was taken out, and at the end it had paper or tape wrapped around it with the blade sticking out maybe an inch." *Id.* at 64. "[T]he taped part was about 2 inches." *Id.* Christine, in his defense, also claimed the weapon was a razor blade, stating that Missero had attacked him with "a very small razorblade, typical razorblade you find and something you shave your face with, about . . . an inch long." N.T., 10/6/2010, at 48.

Guided by *Robinson* and *Marshall,* I am of the view that the shank should not have been admitted into evidence. Here, there was no dispute that the shank was not the weapon used in the fight. Further, there was testimony in this case that razor blades were readily available to inmates at the prison.[4] Moreover, the shank did not corroborate or rebut any testimony.

While the trial court opined that the presence of a shank in Christine's bed "tends to rebut [Christine's] assertion that he was unarmed and acted in self-defense,"[5] I cannot agree that Christine's self-defense claim is rebutted by the fact that a different weapon was found in his bed.[6] Therefore, I would find merit in Christine's claim that the trial court erred in admitting the shank into evidence.

The question remains, then, whether the erroneously admitted evidence constituted harmless error. An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 164 (Pa.1978).

Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by com-

---

**4.** *See* N.T., 10/5/2010, at 65 (testimony of Missero that the prison issued razors to new prisoners); N.T., 10/6/2010, at 21 (testimony of Daniel Rice, a fellow inmate, that razors "were given out" by the prison and "you can purchase them.").

**5.** Trial Court Opinion, 4/26/2011, at 8.

**6.** The Opinion in support of affirmance cites *Commonwealth v. Williams,* 58 A.3d 796, 801 (Pa.Super.2012), *appeal denied,* —— Pa. ——, 68 A.3d 908 (2013), in support of its position that the trial court properly admitted the shank into evidence. In *Williams,* a panel of this Court upheld the trial court's ruling that allowed the admission of a photograph discovered on defendant's phone that showed him posing with a Walther P–38 9–mm pistol, even though the Commonwealth's expert determined that the murder weapon was more

likely a .380 semi-automatic weapon. *Id.* at 801. The *Williams* Court reasoned that the photograph showing appellant with the pistol five days before the murder was relevant to show, *inter alia,* that he had "access to a firearm similar to the one witnesses claimed he was holding when threatening the victim on the night of the murder." *Id.*

Williams, however, is distinguishable, since in this case there was evidence that a razor blade—the actual weapon used in the incident—was available to inmates in the prison. Furthermore, the shank and razor blade were not "similar" as were the guns in *Williams.* A comparison of the descriptions of the shank and razor blade shows that these weapons did not share any unique or distinctive characteristics.

parison that the error could not have contributed to the verdict.

*Robinson, supra,* 721 A.2d at 350 (citations omitted).

Review of the trial testimony reveals the following accounts of the incident. Missero testified that on June 8, 2009, he had only been in the prison unit for 30 to 45 minutes, following one and one-half days in the intake unit. He had finished eating dinner with inmate Jeffrey Rice, when another inmate, Luis Vega, motioned Missero to come over to him. Missero was assigned to Cell 5, and Vega was standing in front of Cell 3, which was Christine's cell. After Missero approached him, Vega asked Missero if he had any tobacco. Before Missero could answer, he testified Christine came from behind the doorway of Cell 3, and pulled him into the cell by grabbing his shirt. Christine started hitting him and yelling, "[Yo]u owe me $20."[7] When Christine eventually stopped, Missero saw blood on his shoe, and inmates were telling him he had "to go to medical" because his neck was "wide open."[8] While Christine was punching him, Vega "closed the [cell] door and blocked the view of the officer."[9] Afterward, Missero noticed a razor blade covered in blood laying on the ground. Missero stated he did not know Christine. He testified he did not have a razor blade on him. He stated the prison issued razors, but he had not been issued a razor.[10] After Missero was cut, Christine told Missero to give him his sneakers. Missero refused, and walked to the corrections officer, who summoned help. *See* N.T., 10/5/2010, at 57–68.

According to Christine, he was reading in his cell when Missero entered the cell to talk to Christine's cellmate, Luis Vega, about tobacco. When Missero saw Christine, Missero ran towards Christine and threw a hot cup of coffee at him, but missed, and they engaged in a fight. Christine noticed Missero had a razor blade, and he took a swipe at Christine, missing him. Christine kicked Missero, who fell and dropped the razor blade. Christine picked up the razor blade from the ground, and unintentionally cut Missero when Missero continued to threaten him. Christine testified that he knew Missero from past occasions.[11] Christine testified that Missero said, "I told you I was going to kill you."[12] He stated Missero "probably tried to put a big scar on my face, [but] he missed."[13] Christine denied telling Missero that Missero owed him $20.00. Christine did not have any scars on his face. He stated no one was in his cell to ask for help and that Luis Vega let the door close and walked away. *See* N.T., 10/6/2010, at 45–53, 59.

Daniel Rice, an inmate, and brother of Jeffrey Rice, testified that he saw Missero walk over to talk to someone in front of

7. N.T., 10/5/2010, at 61.

8. *Id.* at 62.

9. *Id.* at 63.

10. Missero testified he did not "shave that much to this day." *Id.* at 65.

11. Christine testified he and Missero "had hung out on occasion in the City of Easton" and had been together in a juvenile treatment facility when Christine was 16, and Missero was 17. N.T., 10/6/2010, at 47. Christine further stated that "[t]here was an incident ... in Easton where we were talking about ... [a particular] female I just met and it turned out this particular female was his girlfriend. I didn't know that. He told me that if I ever touched her that he would kill me.... I never heard of it since. If this incident was related to that, I don't know." *Id.*

12. *Id.* at 48.

13. *Id.*

Christine's cell, but he was "not sure" if Missero "did or did not have anything in his hand at that time." *Id.* at 15.[14] When Rice opened the cell door, which was closed, he observed Christine and Missero in a wrestling hold. The fight ended, and Christine was "standing there . . . pumped, irritated[.]"[15] Missero was bleeding from his neck, and Rice questioned Christine, who replied that Missero owed him $20.00. Rice testified Christine then demanded Missero's sneakers, and Rice told Missero to go get medical attention. Rice stated that after the fight, Missero had nothing in his hand except a little ball of tobacco, which Missero offered to Rice if he beat up Christine. Rice could not be completely sure if he saw something in Christine's hand because he has astigmatism. He did not see a weapon on the ground. Razor blades were issued and sold by the prison, and it was possible to flush a razor blade down the toilet in the prison. *See id.* at 17–20.

Corrections Officer Nathan Picone testified that he did not witness the fight, or hear a scuffle while he was positioned in the prison unit at the officer's station. After Missero approached him with a large gash in his neck, he called for back-up and proceeded to lock down the block. He noticed blood leading to Christine's cell, and saw bloody towels and bloody T-shirts that "looked like . . . an attempt to clean up what looked to be a large amount of blood."[16] Christine was "obviously shaken, a little nervous [with] a couple of drops of blood on his T-shirt."[17] A search of Christine's cell revealed a shank hidden in Christine's bed. He did not notice any coffee on the floor. There were "40 to 50 cups in the cell."[18] *See id.* at 34–42.

Besides Christine, the defense presented Matthew Garvey, a juvenile probation officer, who testified that Christine and Missero were housed in the same treatment facility from July of 2004 to January 2005. The facility had two separate housing units, and he did not possess the record to determine "if a specific client was in a unit at a certain time, within a certain timeframe." *Id.* at 73. Christopher Boase, a fellow inmate, also testified for the defense. He stated that he was watching television in the day room outside the pod, and did not see the altercation, but he had seen Missero enter the cell and "he looked like angry, like hostile." *Id.* at 75–76.

This case clearly rested on determinations of credibility by the jury. Here, there were no eyewitnesses who testified regarding the onset of the confrontation, other than Missero and Christine. The prejudicial impact of the erroneously admitted shank is obvious given that the issue before the jury was which party was the aggressor. In my view, this was not a case where "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Story, supra.* Therefore, I would find that the trial

---

14. Rice testified that on the day the investigator from the Public Defender's Office came to prison to speak with him about the incident, he saw Christine and Christine asked him to say that he saw Missero coming into Christine's cell with a cup of coffee. Rice stated that it "wasn't . . . the truth." N.T., 10/6/2010, at 23. He stated that Missero "might have had a cup in his hand, I don't know." *Id.*

15. *Id.* at 18.

16. *Id.* at 35.

17. *Id.* at 36.

18. *Id.* at 41.

court's ruling, which allowed the shank to be admitted into evidence, was not harmless error. *See Marshall, supra* at 494 ("[W]e are not faced with a record containing overwhelming evidence of appellant's guilt. We find that the error committed by the lower court was not harmless.").

Accordingly, I would vacate the judgment of sentence and remand for a new trial.