J.S15036/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JOSE OLIVO-NOBLE, | : | |
| | : | No. 1112 MDA 2013 |
| Appellant | : | |

Appeal from the Judgment of Sentence December 6, 2012
In the Court of Common Pleas of Dauphin County
Criminal Division No(s).: CP-22-CR-0000009-2012

BEFORE: BOWES, OLSON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED DECEMBER 22, 2014**

Appellant, Jose Olivo-Noble, appeals from the judgment of sentence entered in the Dauphin County Court of Common Pleas. He challenges: (1) the weight and sufficiency of evidence for his jury convictions of murder in the first degree and aggravated assault;[1] and (2) the preclusion of the victim's prior bad acts as well as evidence that a neighbor heard someone tell the victim to stop reaching for his waist. We affirm.

We glean the following facts from the trial court opinion and trial transcript. Appellant's girlfriend was Jateeyia Thompson, and the victim in this case was Eric Gunraj ("Victim"). Victim often visited the home of his

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 2702(a)(1).

friends, the Freeman family, who lived across the street from Jateeyia's mother's house. On Thanksgiving evening in 2011, Victim, along with his friends Leonard Davis and Larry Brickhouse, went to a pub. Victim said hello to Appellant's girlfriend, Jateeyia, gave her a hug, and then touched or grabbed her buttocks.[2] Trial Ct. Op., 10/11/13, at 1-2, 3; N.T. at 403, 417. Appellant confronted Victim and hit him. They both left the bar, and outside, Appellant again approached Victim and hit him. At trial, Jateeyia testified that she had seen Victim "around in the clubs for [about] a month before the incident." N.T. Trial, 12/3/12 to12/6/12, at 404. Appellant testified that he did not know Victim, but had "seen him once in a while when" he goes to Jateeyia's mother's house. *Id.* at 427. Furthermore, at trial the Commonwealth played surveillance video showing both instances of Appellant hitting Victim. *Id.* at 376-383.

Two nights later, around 5:00 or 6:00 p.m. on November 26, 2011, Appellant went to the house across the street from Jateeyia's mother's house, where Victim visited every day. Appellant approached Ms. Masai Freeman, a resident of the home, and asked if Victim was around. After being told he was not, Appellant told Masai to tell Victim he had stopped by, which Masai did by phone.

Later that night, into the early morning hours, Victim was on the front

---

[2] On direct examination, Jateeyia testified that "at first" she did not know Victim had touched her, but out of the corner of her eye saw Appellant rise and confront Victim. N.T. at 403-04.

porch of the Freeman home, along with Tanisha Freeman—who is Masai's

sister—and Leonard Davis. Jateeyia and her mother were at the mother's

house across the street. Appellant

> approached the [Freeman] house from across the street, stopped at the bottom of the porch stairs and accused [Victim] of "looking for us," as other men approached from the side of the porch. An argument ensued between [Victim] and [Appellant], in which Mr. Davis interjected "What are we arguing for. There's kids in the crib." Mr. Davis continued to intervene and stated "it's all you all against us. We can go in the alleyway and settle our differences." Meanwhile, [Victim] began pulling up his pants. [Appellant] warned [Victim] to "stop reaching." Mr. Davis [told Victim to stop reaching] as well.
>
> Nevertheless, [Victim] persisted to pull at his pants, and [Appellant] drew his gun and began to shoot. Mr. Davis grabbed Tanisha Freeman and pushed her through the front door of the house. As Mr. Davis placed on hand on [Victim] to grab him, he felt the shots hit [Victim's] body. Mr. Davis followed Tanisha . . . in through the door as [Victim's] body dropped to the floor of the porch. After the first round of shots, Tanisha . . . turned toward the direction [Appellant] had run and shouted, "you're going to jail, you're going to jail, you shot him, I am calling the cops you fat expletive, you're going to jail, you're going to jail." While shouting, Tanisha . . . looked out of the house and saw [Appellant] back up [and] shoot a second round of shots into the house. Two of the bullets from the second volley struck Ms. Oveta Johnson in the buttocks as she ran to call the police. [Johnson is Masai and Tanisha's mother and was inside the house.[3] Victim] died on the porch shortly after the shooting.
>
> . . . [Victim] was not in possession of a gun. . . .

Trial Ct. Op. at 2-3 (citing N.T. at 91, 94-97, 123, 153-55, 156-57, 199,

---

[3] N.T.at 197, 199.

216-17).

Wayne Ross, a forensic pathologist who performed an autopsy on Victim, testified to the following. N.T. at 259. Victim sustained four "distant gunshot wounds," all fired from "at least three to four feet away." *Id.* at 261. Two gunshots entered Victim's belly: one went from "right to left" and the other went from "left to right." *Id.* at 264, 266. Victim "was twisting [and] turning as he was being shot," resulting in the "different pathways [of] the bullets." *Id.* at 268. The other two gunshots were to Victim's back shoulder and lower right leg. *Id.* at 265, 267. "The autopsy also revealed that [Victim] had a blood alcohol level of .227 but no abuse of drugs." Trial Ct. Op. at 3 (citing N.T. at 269-70).

We add that Appellant testified in his defense to the following. On the day after the incident at the pub, around 6:00 or 7:00 p.m., he went to Jateeyia's mother's house. Jateeyia, told him that Victim wanted to talk to him. N.T. at 430, 432. Appellant went across the street and encountered Masai, who was exiting her door. Appellant asked for Victim, Masai said he was not there, and Appellant asked her to tell Victim that he was looking for him because Victim had asked to talk to him first. Masai agreed and Appellant left.

Appellant further testified to the following. Around 2:40 a.m., he returned to Jateeyia's mother's house. *Id.* at 437-38. As he was walking on the sidewalk, Victim called to him from a porch and said, "I heard you [are]

looking for me." *Id.* at 438, 439. Appellant walked over, stood six to eight feet from Victim, and said, "[N]o, I heard you was looking for me." *Id.* at 439. Tanisha Freeman was also on the porch, and she said Appellant was there earlier looking for Victim. *Id.* at 440. Appellant told her that he was there earlier and spoke with a young girl. Appellant was not angry but wanted to "[r]esolve the situation [they] had the night before." *Id.* at 441. Appellant denied that anyone came to either side of the porch. *Id.* at 441-42.

As Appellant was talking to Tanisha, Victim reached with his right hand, and Appellant told him to "stop reaching." *Id.* at 442. Victim "stopped reaching and started smiling." *Id.* Appellant said he did not go there for any problems, but instead because Victim said he wanted to talk. Victim "reach[ed]" a second time, Appellant said, "[Y]o, stop reaching," and Victim "stopped reaching and started laughing again." *Id.* at 444. At that point, the door opened. Appellant testified as follows:

> So [Tanisha] Freeman says, whatever you all gotta do. So I thought, okay, that's respectful. So come over the porch and we can talk. No, you can talk from there. So I'm like, wow, like, okay. She gets up from her seat, starts walking behind him.
>
> When she starts walking behind him, I'm just looking, like I'm facing the street, I'm just looking, like, what's up man, what's it going to be. Are you going to come down so we can talk. At that point in time he reaches.

*Id.* at 444-45. Victim continued to smile, smirk, and reach, and lifted his shirt with his left hand, revealing a black gun. *Id.* at 445. Appellant

testified, "At that point in time I fear for my life." ***Id.***

Appellant grabbed his own gun, which was on his left hip and fired four shots. ***Id.*** at 446. As soon as he started firing, he also ran away. ***Id.*** Appellant did not see whether Victim was shot. As Appellant was running, he heard a boom, "felt something pass" him, and then, "without looking . . . threw [his] hand back and fired four more shots." ***Id.*** at 448.

On December 6, 2012, the jury found Appellant guilty of murder in the first degree for the killing of Victim, and aggravated assault for shooting Oveta Johnson.[4] Immediately thereafter, the trial court imposed a sentence of life imprisonment on the murder conviction.[5] Appellant filed a post-sentence motion, which was denied on June 14, 2013, by operation of law. Appellant filed a timely notice of appeal and complied with the court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

In his first issue, Appellant challenges the sufficiency and weight of the evidence for first-degree murder.[6] He concedes "he was responsible for the killing and did so with the specific intent to kill," but he alleges the

---

[4] 18 Pa.C.S. §§ 2705, 6106(a)(1).

[5] The court also imposed the following sentences, all to run concurrent with the life sentence: for aggravated assault—four to eight years, for recklessly endangering another person—one to two years, and for the firearm violation—two to four years. N.T. at 570, 575-76.

[6] Appellant has preserved the weight of the evidence issue as he raised it in his post-sentence motion. ***See*** Pa.R.Crim.P. 607(A)(1)-(3); Appellant's Post-Sentence Mot., 12/21/12, at 8 (unpaginated).

Commonwealth failed to disprove his theory of self-defense. Appellant's Brief at 35. Appellant reiterates his "uncontested testimony [that he saw Victim] reach . . . three times into his pants while . . . Appellant kept telling him to 'stop reaching' because he believed that [Victim] was reaching for a gun in the waistband of his pants."[7] *Id.* at 25. Appellant adds that Victim's friend Leonard Davis, as well as his own girlfriend Jateeyia Thompson, "confirm[ed this] testimony." *Id.* at 26, 27, 29. Appellant reasons that the Commonwealth "cannot sustain its burden of disproving . . . self-defense . . . solely on the factfinder's disbelief of the accused's testimony." *Id.* at 35. Appellant concludes he "had a well-grounded, reasonable belief that his own life was in danger and he was legally entitled to respond with . . . deadly force." *Id.* at 30. We find no relief is due.

We first note:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the

---

[7] We note that while Appellant testified at trial that he saw a black gun on Victim's person, N.T. at 445, on appeal he avers Victim "lifted up his shirt **as if to reach for** a gun." Appellant's Brief at 33 (emphasis added).

combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

Our Crimes Code defines murder in the first degree as a criminal homicide "committed by an intentional killing." 18 Pa.C.S. § 2502(a). Section 505 provides for self-defense: "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S. § 505(a).

This Court has summarized:

The defendant has no "burden to prove" his self-defense claim.

\* \* \*

While there is no burden on a defendant to prove the [self-defense] claim, before that defense is properly at issue at trial, there must be some evidence, from whatever source to justify a finding of self-defense. If there is any evidence that will support the claim, then the issue is properly before the fact finder.

If the defendant properly raises "self-defense under Section 505 . . . the burden is on the Commonwealth to

prove beyond a reasonable doubt that the defendant's act was not justifiable self-defense."

> The Commonwealth sustains this burden if it establishes at least one of the following: 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety.

The Commonwealth must establish only one of these three elements beyond a reasonable doubt to insulate its case from a self-defense challenge to the evidence. The Commonwealth can negate a self-defense claim if it proves the defendant did not reasonably believe he was in imminent danger of death or great bodily injury and it was necessary to use deadly force to save himself from that danger.

> The requirement of reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant must have acted out of an honest, bona fide belief that he was in imminent danger, which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

[T]he use of deadly force itself "cannot be viewed in isolation with [the victim] as the sole physical aggressor and [the defendant] acting in responsive self-defense. [T]his would be an incomplete and inaccurate view of the circumstances for self-defense purposes." To claim self-defense, the defendant must be free from fault in provoking **or escalating** the altercation that led to the offense, before the defendant can be excused from using deadly force. Likewise, the Commonwealth can negate a self-defense claim by proving the defendant "used more force than reasonably necessary to protect against death or serious bodily injury."

> When the defendant's own testimony is the only evidence of self-defense, the Commonwealth must still disprove the asserted justification and cannot simply rely on the jury's disbelief of the defendant's testimony:
>
> > The "disbelief of a denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact." The trial court's statement that it did not believe Appellant's testimony is no substitute for the proof the Commonwealth was required to provide to disprove the self-defense claim.
>
> > If there are other witnesses, however, who provide accounts of the material facts, it is up to the fact finder to "reject or accept all, part or none of the testimony of any witness." The complainant can serve as a witness to the incident to refute a self-defense claim. "Although the Commonwealth is required to disprove a claim of self-defense arising from any source beyond a reasonable doubt, a [fact-finder] is not required to believe the testimony of the defendant who raises the claim."
>
> > A number of factors, including whether complainant was armed, any actual physical contact, size and strength disparities between the parties, prior dealings between the parties, threatening or menacing actions on the part of complainant, and general circumstances surrounding the incident, are all relevant when determining the reasonableness of a defendant's belief that the use of deadly force was necessary to protect against death or serious bodily injuries. No single factor is dispositive. . . .

*Smith*, 97 A.3d at 787-88 (citations omitted).

The trial court reasoned, "The Commonwealth proved beyond a reasonable doubt that [Appellant] did not shoot in self-defense as the Commonwealth's evidence demonstrated that [Appellant] did not believe it was necessary to kill [Victim] in order to protect himself from serious bodily injury." Trial Ct. Op. at 4. In support, it stated:

[Appellant] claims he saw [Victim] with a black gun and therefore he had no choice but to draw his gun and fire four shots. (N.T. at 445-46). . . . The Commonwealth's evidence, however, demonstrated [that Appellant] came looking for [Victim. ***Id.*** at 209, 211-13.] When [Victim] was not there, [Appellant] returned . . . that same evening armed with a gun. [***Id.*** at 153. Appellant] brought friends with him and confronted [Victim]. Then, as an argument escalated, [Appellant] without provocation proceeded to wield a gun, despite [Victim] being unarmed, and shoot four times including one to the back, each bullet hitting [Victim] and resulting in a severed aorta. [***Id.*** at 154-57, 264-65.] In this case, the jury found the testimony of the Commonwealth witnesses more credible than [Appellant's]. In short, the Commonwealth presented evidence that [Appellant] sought out and initiated the contact, only [Appellant] had [a] weapon, only [Appellant] drew a weapon, and only [Appellant] fired. The jury found that the Commonwealth proved beyond a reasonable doubt that [Appellant] did not believe that . . . at the time he shot [Victim, Appellant] was in imminent danger of serious bodily injury.

***Id.*** at 6.

We agree with the court's findings. At trial, the Commonwealth showed surveillance video taken from the pub two nights before the shooting. N.T. at 376. The video showed Jateeyia inside the pub hug Victim and then Victim "strike her on the rear end" or "[give] her a little pat on the behind." ***Id.*** at 378-79. Appellant and Victim exchanged "some words back and forth, and then [Appellant] punched" Victim. ***Id.*** at 379. Surveillance video also showed Appellant and Victim outside the bar, where Appellant "walked over towards [Victim] and struck him." ***Id.*** at 381-82.

Although Appellant repeatedly stated he was responding to Victim's request to see him, Appellant does not dispute that two days after the

incident at the pub, he twice sought out Victim at the house where he was known to visit. Additionally, Appellant himself testified that upon approaching Victim on the porch, Victim denied that he—Victim—was looking for Appellant; Appellant stated, "We went back and forth probably like three or four times." N.T. at 440. Another fact that Appellant emphasizes is that he told Victim three separate times to stop reaching for his pants or waistband. In response to the first two commands to "stop reaching," Victim allegedly smiled or smirked. *Id.* at 442. Appellant could have left at that time, but instead continued talking to Victim and Tanisha.

We also note the Commonwealth's argument that despite Appellant's testimony that he fired his gun while ducking his head and running away, he "managed to fire four shots," all of which struck Victim. Commonwealth's Brief at 16 (citing N.T. at 465-66). The record supports this observation: Appellant testified that he fired three shots, but was not "looking where [he] was] firing" because he did not want to be hit himself. N.T. at 465. The forensic pathologist testified that Victim suffered four gunshots, two of which were to his belly from different directions, which indicated Victim was "twisting" and "turning as he was being shot." *Id.* at 264, 268.

The above evidence establishes that Appellant provoked and continued the use of force and failed to retreat. *See Smith*, 97 A.3d at 787. The jury was free to believe the above evidence, and we decline to find the trial court abused its discretion in denying Appellant's challenges to the sufficiency and

weight of the evidence. **See id.** at 790. Accordingly, we do not disturb Appellant's conviction for murder in the first degree.

In his second issue, Appellant challenges the sufficiency and weight of the evidence for his aggravated assault conviction, which arises from shooting Oveta Johnson twice in the buttocks. Specifically, he claims Johnson did not suffer serious bodily injury. In support, Appellant recounts that Johnson was treated at a local hospital and released without any surgery.[8] He claims that there are no "Pennsylvania decisions on point," but cites several out-of-state cases that hold "a mere gunshot wound—without more—does not a serious bodily injury make."[9] Appellant's Brief at 36. Appellant also contends there was insufficient evidence that he intended to inflict serious bodily injury on Johnson. He maintains that "[s]he was hit by bullets [fired] as he ran from the scene" and "[h]e was not firing at anyone specifically . . . but rather in the general direction of" Victim. **Id.** at 40. Finally, Appellant reiterates his claim that he was acting in self-defense and thus his use of force was justified. We find no relief is due.

"[U]nder the doctrine of transferred intent, an offender who intentionally acts to harm someone but ends up accidentally harming

---

[8] Appellant also reasons that the scars on Johnson's buttocks are "not exactly visible, and while Johnson testified that she has pain, "it hardly sounds severe." Appellant's Brief at 39.

[9] In support, Appellant cites decisions from Tennessee, the District of Columbia Court of Appeals, and Alabama.

another is criminally liable as if the offender had intended to harm the actual victim." ***Commonwealth v. Bullock***, 913 A.2d 207, 218 n.11 (citation omitted); ***see also*** 18 Pa.C.S. § 303(b)(1). The doctrine of transferred intent applies to a charge of aggravated assault. ***Commonwealth v. Jackson***, 955 A.2d 441, 449-50 (Pa. Super. 2008).

As stated above, Appellant concedes he intended to cause serious bodily injury to Victim: "It was never . . . Appellant's conscious object to cause serious bodily injury to anyone other than [Victim], and certainly not to Ms. Johnson or any other occupant of the home." ***Id.*** at 41. Johnson was on the porch with Victim, and she was hit by two gunshots which, as Appellant himself explains, were meant to hit Victim. Furthermore, we have held above that Appellant's reliance on his self-defense theory is meritless. Accordingly, we hold that under the transferred intent doctrine, Appellant is liable for the harm caused to the accidental victim, Johnson. ***See Jackson***, 955 A.2d at 449-50; ***Bullock***, 913 A.2d at 218 n.11. We affirm the court's denial of the sufficiency and weight of the evidence claims.[10]

In this third issue, Appellant avers the trial court erred in denying his motion *in limine* to admit evidence tending to show Victim had a "violent character and that he was the aggressor." Appellant's Brief at 44. Specifically, Appellant sought to present evidence that in the pub, Victim had

---

[10] Although the trial court did not base its ruling on a transferred intent analysis, we may affirm on any basis. ***See Commonwealth v. Dixon***, 997 A.2d 368, 374 n.9 (Pa. Super. 2010) (*en banc*).

- 14 -

said, "I'm Blood, I'm Blood," had a tattoo on his forearm that said "sex, murder, drugs," and had a 2004 conviction for sexual assault. Appellant claims that Victim was in "a violent Harrisburg city street gang called 'Blood'" and his nickname was 'Blood.'" *Id.* at 44, 45. Furthermore, Appellant asserts the court erred in holding a defendant must be aware of a victim's violent past for admission of evidence of that violent past. We hold no relief is due.

We set forth the relevant standard of review:

> Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

*Commonwealth v. Akbar*, 91 A.3d 227, 235 (Pa. Super. 2014) (citation omitted).

In the instant matter, the trial court excluded evidence of Victim's alleged gang membership "as irrelevant because [Appellant] had no knowledge of [these] underlying facts at the time of the incident." Trial Ct. Op. at 12. The court opined that Appellant had to have been aware of Victim's alleged violent propensities for this evidence to have probative value for self-defense purposes. Both the trial court and Appellant cite the Pennsylvania Supreme Court's decision in *Commonwealth v. Amos*, 284 A.2d 748 (Pa. 1971), in support of their positions.

An equally divided *en banc* panel of this Court considered **Amos** in **Commonwealth v. Christine**, 78 A.3d 1 (Pa. Super. 2013) (*en banc*), *appeal granted*, 86 A.3d 831 (2014). One issue in **Christine** was whether the trial court erred in precluding evidence of the victim's simple assault conviction incurred **after** the incident giving rise to the defendant's charges. **Id.** at 4. The opinion in support of affirmance stated:

> Our Supreme Court has held that "as far back as 1884, [Pennsylvania courts have] permitted the introduction of character evidence to prove the decedent's violent propensities, where self-defense is asserted and where there is an issue as to who was the aggressor." Further, our Supreme Court has specifically held that the victim's criminal record can be admissible on two distinct grounds[:]
>
> > (1) to corroborate [the defendant's] alleged knowledge of the victim's quarrelsome and violent character **to show that the defendant reasonably believed that his life was in danger**; or (2) to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor.
>
> > \* \* \*
>
> > **Nor do we mean to suggest that our decision here abandons the rule**. . . **that the defendant must first establish a foundation of his knowledge of the victim's convictions before he can introduce the corroboratory record when the defendant is seeking to prove his belief that he was in imminent danger of bodily harm**. Here again, the determination whether or not the defendant demonstrates a sufficiently particular knowledge of the victim's record rests within the sound discretion of the trial court.
>
> [**Amos**, 284 A.2d at 752.] We highlight that **our Supreme Court held that a defendant must lay a**

> **foundation for his knowledge of the victim's convictions only when he "is seeking to prove his belief that he was in imminent danger of bodily harm."** [**Id.**] It therefore logically follows that a defendant need not establish knowledge of the victim's record in order "to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor." [**Id.** at 750.] In every case, the defendant is also required to show that the convictions sought to be introduced "are similar in nature and not too distant in time" from the underlying incident. Because [the defendant] wished to use [the victim's] subsequent conviction to establish the second **Amos** ground as opposed to the first, [the defendant] was not required to show specific knowledge of the conviction. **See** [**id.** at 750, 752.]

**Christine**, 78 A.3d at 4-5 (emphases added) (some citations omitted).

The opinion in support of reversal stated,

> Although **I agree that the trial court properly precluded cross examination questioning of the victim** . . . **regarding his simple assault conviction**, I write separately to express my view that the conviction was not relevant because the conviction and underlying conduct occurred subsequent to the prison incident. . . .

**Id.** at 11.

Although neither opinion in **Christine** is binding precedent, we find they provide guidance in the instant matter. The latter opinion did not disagree with the first opinion's synopsis of **Amos**. Both opinions agreed that pursuant to **Amos**, a defendant must establish knowledge of the victim's prior convictions when the defendant seeks to prove his own belief

- 17 -

that he was in imminent danger of bodily harm.[11] *Id.* at 5, 11. Instead, the basis of the disagreement was whether the victim's **subsequent** conviction of simple assault was relevant to prove the victim's allegedly violent propensities and to show the victim was in fact the aggressor. *See id.* Such an issue—the admission of the victim's **subsequent** bad acts—is absent in the instant case.

We next must review the purpose for which Appellant intended to introduce this evidence about Victim. Pursuant to **Christine** and **Amos**, if Appellant sought to corroborate his testimony that he "reasonably believed that his life was in danger" or he was in imminent danger of bodily harm, then Appellant had to establish his prior knowledge of Victim's violent character. **See Amos**, 284 A.2d at 750; **Christine**, 78 A.3d at 5. If, however, Appellant sought only to show Victim was the initial aggressor, without any other inference, then he was not required to show he knew of

---

[11] **See also Commonwealth v. Beck**, 402 A.2d 1371, 1373 (Pa. 1979) ("A defendant . . . need not have knowledge of a victim's criminal conviction in order to introduce the prior conviction showing the aggressive propensities of the victim."); **Commonwealth v. Horne**, 388 A.2d 1040, 1042 (Pa. 1978) ("When a defendant alleges self defense, he may under proper circumstances introduce the victim's conviction and arrest records to corroborate his alleged knowledge of the victim's violent character or his alleged belief that his life was in danger. . . . [H]owever, it is the defendant's knowledge of the charges contained in that record that makes the record admissible because [it is] probative of the defendant's state of mind."); **Commonwealth v. Brown**, 477 A.2d 1364, 1372 (Pa. Super. 1984) ("Appellant must be aware of the alleged violent propensities of the victim, for testimony concerning the alleged violence to have probative value for self-defense purposes.").

Victim's prior bad acts. **See Amos**, 284 A.2d at 750; **Christine**, 78 A.3d at 5.

The relevant portion of Appellant's motion *in limine* was comprised of four numbered sentences. The first two sentences pertained to Appellant's intent to raise self-defense at trial and argue "he reasonably believed that he was in danger of suffering serious bodily injury or death." Appellatn's Mot. *In Limine*, 11/27/12, at 1. The third sentence was the Victim's membership in a violent street gang was "relevant to establish [his] propensity for violence/aggressive behavior[.]" **Id.** The last sentence was, "There is authority that evidence of membership in a gang is admissible." **Id.** (citations omitted). When read together, Appellant's motion *in limine*, while short, invoked both bases to admit the evidence: Appellant's self-defense and Victim's role as the initial aggressor.

The trial court briefly addressed Appellant's motions *in limine* just before the start of trial. The parties acknowledged the court's prior ruling that Victim's alleged gang membership, his nickname "Blood," and his "sex, murder, drugs" tattoo were irrelevant because Appellant was not aware of it. N.T. at 9, 10. Appellant then argued that the information would not be offered to establish his fear at the time of the shooting, but instead to establish the fact that Victim was the aggressor. **Id.** at 9-10. The court

again stated that Appellant was not previously aware of these things.[12] *Id.*
at 10.  On appeal, Appellant advances both proffers: the evidence would
have "establish[ed Victim's] propensity for violence **and** . . . support[ ]
Appellant's affirmative defense of self-defense.  Appellant's Brief at 44.

Despite Appellant's assertion just before trial that his proffer was
merely to establish Victim's role as the aggressor, we hold the trial court
properly required Appellant to show he had prior knowledge of Victim's
violent character or prior bad acts.  The central issue at trial, advanced by
both Appellant's testimony and argument, was self-defense: whether
Appellant reasonably believed Victim was reaching for a gun and that he—
Appellant—he was in imminent danger of death or serious bodily harm.
Thus, we agree, pursuant to **Christine** and **Amos**, that Appellant had to
establish he was aware of Victim's alleged membership in a gang.  **See**
**Amos**, 284 A.2d at 750; **Christine**, 78 A.3d at 5.  We affirm the trial court's
preclusion of this evidence.

With respect to Victim's 2004 conviction for sexual assault, the trial
court excluded it on the basis that it was too remote to have probative
value.  We do not find an abuse of discretion in this ruling.  We add that the
sexual assault conviction is not "similar in nature" to the actions Appellant

---

[12]  Appellant's counsel then made the following seemingly inconstant statement: "For the record, for whatever it's worth, [Appellant] was aware of that [sic] but he will not come into this courtroom, take the stand and lie, for whatever that's worth."  N.T. at 11.

attributed to Victim at trial—that Victim was reaching into his pants for a gun. ***See id.***

Appellant's final claim in this appeal is that the trial court erred in excluding this testimony "Shirley Thompson, a neighbor from across the street[:] I heard someone say don't reach." Appellant's Brief at 55-56. ***See*** N.T. at 393. At this juncture, we summarize that Shirley was a defense witness, the Commonwealth objected to the above testimony, the parties argued at sidebar, and the trial court sustained the objection on hearsay grounds. N.T. at 393-94. In its opinion, the trial court opined that "the proferred statement [did] not address" Appellant's state of mind, and instead was an assertion of Victim's conduct at that time—that Victim was reaching. Trial Ct. Op. at 14. The trial court also reasoned that even if the testimony were admissible, its ruling was harmless error because evidence that Appellant told Victim, "Stop reaching," was already introduced through other witnesses.

On appeal, Appellant maintains that Shirley's testimony was admissible under the hearsay exception at Pa.R.E. 803(3) to establish his—Appellant's—state of mind at the time of the incident. Appellant also challenges the court's finding that he did not suffer prejudice, as this "was a very important point: that [Victim] kept ignoring warnings from Appellant and [Victim's] friend to stop reaching into his pants because it seemed [Victim] was about to draw and fire a weapon." Appellant's Brief at 56-57.

Appellant asserts that Shirley "was a completely disinterested witness" and "was not known to . . . Appellant," and thus her corroboration of Appellant's repeated warnings "were critically important for the jury's consideration." *Id.* at 57. We find no relief is due.

As stated above, our standard of review for an evidentiary ruling is abuse of discretion. ***Akbar***, 91 A.3d at 235. "Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' . . . Pa.R.E. 801(c)." ***Id.*** at 236. The comment to Rule 801 states in part, "Communications that are not assertions are not hearsay. These would include questions, greetings, expressions of gratitude, exclamations, offers, instructions, **warnings**, etc." Pa.R.E. 801, *cmt.* (emphasis added). "A statement is hearsay only if it is offered to prove the truth of the matter asserted in the statement. There are many situations in which evidence of a statement is offered for a purpose other than to prove the truth of the matter asserted." ***Id.***

With respect to harmless error, our Supreme Court has stated:

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict."

*Commonwealth v. Hutchinson*, 811 A.2d 556, 561 (Pa. 2002) (citation omitted).

We first reject Appellant's claim that the witness, Shirley Thompson, was not known to him and was a disinterested witness. At trial, Shirley testified she was the mother of Jateeyia Thompson and that she—Shirley—had known Appellant for almost thirteen years and had worked with him for three or four years. N.T. at 390-91.

Next, we hold Shirley's statement was not hearsay. Her testimony was that she "heard someone say don't reach." *Id.* at 393. The statement, "Don't reach," was a warning or a command, and was not intended to show the truth of whether anyone was reaching. *See* Pa.R.E. 801(c) & *cmt*. Accordingly, the trial court erred in excluding that testimony on hearsay grounds. However, we agree with the trial court's alternate reasoning that its ruling was harmless error. As the trial court observed, and Appellant himself notes elsewhere in his brief, testimony that Appellant told Victim to stop reaching was presented by Appellant himself and his girlfriend Jateeyia. *See* N.T. at 413, 442, 444. Additionally, Victim's friend, Leonard Davis, testified that both he and Appellant told Victim to stop reaching. *Id.* at 153, 154. Furthermore, Shirley testified only that she "heard someone say don't reach," and did not identify the speaker. *See id.* at 393. Accordingly, Shirley's testimony would have been "merely cumulative of other untainted evidence." *See Hutchinson*, 811 A.2d at 561. Thus, we decline to grant

relief on this issue.

Finding no relief due on Appellant's claims, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2014