J-S04021-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RAYMOND DANIELS | |
| Appellant | No. 1618 EDA 2019 |

Appeal from the Judgment of Sentence Entered May 23, 2019
In the Court of Common Pleas of Bucks County
Criminal Division at No: CP-09-CR-0000832-2018

BEFORE:  BENDER, P.J.E., STABILE, and MURRAY, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 7, 2020**

Appellant, Raymond Daniels, appeals from the May 23, 2019 judgment

of sentence imposing an aggregate 30 to 60 years of incarceration for robbery,

burglary, conspiracy,[1] and related offenses.[2]  We affirm.

On the evening of August 17, 2017, Appellant and several

coconspirators conducted surveillance of the victims' home in Newtown

---

[1]  18 Pa.C.S.A. §§ 3701, 3502, and 903.

[2]  These include unlawful possession of a firearm (18 Pa.C.S.A. § 6105), criminal trespass (18 Pa.C.S.A. § 3503), theft by unlawful taking (18 Pa.C.S.A. § 3921), theft by extortion (18 Pa.C.S.A. § 3923), receiving stolen property (18 Pa.C.S.A. § 3925), false imprisonment of a minor and false imprisonment (18 Pa.C.S.A. § 2903), criminal coercion 18 Pa.C.S.A. § 2906), terroristic threats (18 Pa.C.S.A. § 2706), unlawful restraint of a minor (18 Pa.C.S.A. § 2902), recklessly endangering another person (18 Pa.C.S.A. § 2705), simple assault (18 Pa.C.S.A. § 2701), and access device fraud (18 Pa.C.S.A. § 4106).

Township, Bucks County.[3]  During the late hours of August 20, 2017 and the early morning hours of August 21, 2017, Appellant and his cohorts returned. They entered the home at 2:00 a.m. on August 21, 2017 carrying firearms and wearing masks, gloves, and dark clothing.  Sisters Elle Nadav, aged 25, and C.N., aged 12, were in the home, along with their parents, Jonatan and Emily Nadav, and their maternal grandmother, Manya Guravich.  A third, sister, Jade, was away at college.

Upon gaining entry to the home through a window, two of the gunmen approached Elle, woke her, and pointed guns at her.  The gun barrels touched her forehead.  The gunmen forced Elle to lie on the floor on her stomach and then bound her hands with shoelaces.  They told her they were there for "Yanni," Jonatan's nickname.  Elle screamed and asked that they not harm Manya or C.N.  One gunman remained with Elle and located and took her wallet and cell phone.  Another gunman woke up Manya, forced her out of bed, and retrieved a watch from a drawer in Manya's room.  English is not Manya's first language, and she was unable to understand what the gunman said to her.

A third gunman woke C.N. and forced her out of bed.  The gunman led C.N. to her parents' room and forced her to wake them up.  Thus, Jonatan and Emily woke to the sight of their 12-year-old daughter being held at

---

[3]  We are summarizing the facts as set forth on pages 1-5 of the trial court's September 6, 2019 opinion.

gunpoint. The gunmen knew the family had a safe in their home, and they ordered Emily and Jonatan to tell them where their safe was, and open it. They threatened to shoot and kill C.N. if Emily and Jonatan refused. Eventually Jonatan, who owns several clothing stores in the Philadelphia area, opened the safe at gunpoint. The gunmen removed a large amount of jewelry and $50,000 in cash from the safe. In all, the gunmen stole more than $300,000 in property and cash from the Nadav home.

Emily, Jonatan, and Manya were forced into a closet and warned that they would be killed if they called the police. Before departing, the gunmen told Elle where her sister Jade went to college and described Jade's car. They told Elle that Jade would be killed if the family called the police. Emily called the police after the gunmen left.

Later that morning, Appellant and his girlfriend went to five different locations and used credit cards stolen from the Nadavs. Appellant also wrote a stolen check, for $5,500.00, to his girlfriend. Also on that morning, Appellant exchanged text messages with one of his coconspirators. The message from the coconspirator included emoji depicting moneybags and an arm making a muscle. The coconspirator wrote, "I'm excited as shit, bro." Appellant responded, "Me too, man. That watch worth 34 grand online."

On November 14, 2017, the Commonwealth charged Appellant and his coconspirators with numerous offenses. On January 24, 2019, during jury selection, Appellant pled guilty to robbery, burglary, conspiracy, and the

offenses listed in footnote 2 above. Sentencing followed immediately, and the trial court imposed an aggregate 40 to 80 years of incarceration. Appellant filed a timely motion for reconsideration on February 1, 2019. The trial court granted reconsideration, and on May 23, 2019 sentenced Appellant 30 to 60 years of incarceration. That sentence is comprised of three consecutive mandatory sentence of 10 to 20 years for robbery, burglary, and conspiracy to commit robbery. The trial court imposed concurrent sentences for unlawful possession of a firearm, false imprisonment of a minor, false imprisonment, simple assault, and access device fraud. The court imposed no further penalty on the remaining offenses.

Appellant filed this timely appeal on May 29, 2019. In his sole assertion of error, he claims the trial court abused its sentencing discretion in imposing 30 to 60 years of incarceration. Before we address the merits of a challenge to the trial court's sentencing discretion, we must discern whether Appellant has properly placed that issue before us. To do so, an appellant must (1) file a timely notice of appeal; (2) preserve the issue in a motion to reconsider or modify the sentence; (3) include in his brief a concise statement of reasons relied upon for allowance of appeal (Pa.R.A.P. 2119(f)); and (4) explain in the concise statement that there is a substantial question as to whether the trial court's sentence was appropriate. ***Commonwealth v. Caldwell***, 117 A.3d 763, 768 (Pa. Super. 2015), ***appeal denied***, 126 A.3d 1282 (Pa. 2015).

Instantly, Appellant did not file a post-sentence motion after the trial court's May 23, 2019 sentence. Further, he fails to present a substantial question for our review. To demonstrate a substantial question, the appellant must show that the trial court's sentence was inconsistent with the sentencing code or contrary to the norms underlying the sentencing process. *Commonwealth v. Titus*, 816 A.2d 251, 255 (Pa. Super. 2003). A generic assertion of excessiveness does not raise a substantial question. *Commonwealth v. Christine*, 78 A.3d 1, 10 (Pa. Super. 2013), *affirmed*, 125 A.3d 394 (Pa. 2015). An allegation that the trial court failed to give adequate weight to mitigating circumstances does not raise a substantial question. *Commonwealth v. Disalvo*, 70 A.3d 900, 903 (Pa. Super. 2013); *Commonwealth v. Moury*, 992 A.2d 162, 175 (Pa. Super. 2010).

In his Pa.R.A.P. 2119(f) statement, Appellant states that the trial court imposed "a manifestly excessive sentence resulting in too severe a punishment under all the circumstances, particularly when considering that Appellant pled guilty and presented mitigating evidence at the time of sentence." Appellant's Brief at 8. This is both a bald assertion of excessiveness and a claim that the trial court gave inadequate weight to mitigating factors. [4] Appellant has failed to raise a substantial question, and

---

[4] We discern the existence of a substantial question solely by reference to the 2119(f) statement. *Commonwealth v. Goggins*, 748 A.2d 721, 726-27 (Pa. Super. 2000), *appeal denied*, 759 A.2d 920 (Pa. 2000). In the argument

we therefore do not reach the merits of his argument. Were we to address the merits, we would affirm the sentence based on the trial court's September 6, 2019 opinion. We direct that a copy of that opinion be filed herewith.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/7/2020

---

section of his brief, Appellant elaborates on his educational history, work history, and two dependent children. Nothing in the argument section would alter our conclusion that Appellant has failed to raise a substantial question.

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :   No.   CP-09-CR-0000832-2018
                                                  [1618 EDA 2019]

                v.                    :

RAYMOND ANTHONY DANIELS       :

### OPINION

The Defendant, Raymond Anthony Daniels, has filed an appeal from the judgment of sentence entered on May 23, 2019 following his guilty plea on January 24, 2019. On appeal, the Defendant challenges the discretionary aspects of sentence.

On November 14, 2017, the Defendant was charged with multiple offenses in connection with a home invasion robbery that occurred at 23 Wellington Road, Newtown Township, Bucks County, the residence of Jonatan and Emily Nadav and their family. Co-defendant Sadeen Jones (Jones) was charged on November 16, 2017. Co-defendant Brandon Davis (Davis), was charged on January 2, 2018. Other individuals involved in this incident remain unidentified.

The facts underlying the Defendant's convictions were summarized at the time of the guilty pleas as follows:

> On August 15 of 2017 the [D]efendant, along with co-defendants Brandon Davis and Sadeem [sic] Jones traveled to 23 Wellington Road in Newtown Township, Bucks County, for the purpose of scoping out, for lack of a better term, the location at 23 Wellington Road, Newtown, Bucks County. That was the home of the Nadavs, who are pictured in Commonwealth's Exhibit C-2 . . . .

That was done at night. . . . [a]nd . . . would have been proven at trial through cellular telephone records as well as text messaging between the defendants.[1]

[During] . . . the late evening hours of August 20, 2017, into the early morning hours of August 21, 2017, the same individuals: The [D]efendant Raymond Daniels, Brandon Davis and Sadeem [sic] Jones, as well as others unidentified in this case . . . traveled together from Philadelphia to the same location, 23 Wellington Road in Newtown, Bucks County.

\*\*\*

[O]n that day . . . three of the individuals were masked, dressed in dark clothing, gloved and armed with guns, and entered 23 Wellington Road, Newtown Township, Bucks County, at approximately 2:00 o'clock in the morning.

At the time that they entered . . . there were five individuals home, five members of that residence. [Twelve]-year-old [C.N.] . . . [twenty-five]-year-old Elle Nadav . . . Emily Nadav, who is their mother . . . Jonatan Nadav . . . as well as Manya Guravich, who is the grandmother of the two sisters I referred to.

[Jade] . . . was not home. She was away at college. She is the third sister in the Nadav family.

The defendants entered. There were two identified possible points of entry. . . . a basement window in the back of the house . . . . [and] . . . a front window at the front of the house near the front door where the screen had been broken off.

\*\*\*

The individuals then entered the location and two of the individuals went downstairs into the basement where Elle Nadav had been staying . . . [in] a basement apartment . . . .

She would testify . . . that she was in bed and awoken by the sound of loud feet coming down the steps. As she sat up in her bed, there were two men in all black holding guns. The guns were then pointed at her head and she said she could actually feel the barrel of the gun against her forehead – both guns against her forehead.

She began to scream and was told to, quote, shut the f[---] up. . . . She was then removed from her bed, told to get on the ground on her stomach. [She complied] . . . and was [then] tied with a shoelace at her wrists.

---

[1] Cell site data and text messages established that the conspirators traveled to the victims' residence six days before the home invasion robbery. Text messages between the conspirators also established that they planned to go to the victims' residence on the date the offenses were committed. N.T. 1/24/19, at 125-126.

2

One of the individuals then received a phone call. Elle Nadav would testify that she then heard that individual indicate, "We are in."

That individual left her room while the second gunman remained with her.

She would testify . . . that what was told to her was they were there for Yanni, the nickname of her father, Jonatan Nadav. She would testify that she cried and screamed and asked that nothing happen to her 12-year-old sister, [C.N.], or her grandmother.

She would testify . . . that at that point the one individual remained with the gun pointed at her, took her wallet and took her cell phone so she was unable to call for help.

At that point . . . evidence would show that a second individual -- it is unknown if it was the same person who had previously been in Elle's room or not -- had gone to Manya Guravich's room. Manya Guravich is the grandmother of Elle and [C.N.] . . . .

She was asleep in her bedroom which is on the second level of the townhome at 23 Wellington.

She would testify that an individual woke her up and began screaming at her. Manya's first language is not English and she has trouble hearing. So she would testify she could not understand what was being screamed at her and kept trying to tell the gunman who had a gun pointed at her that she couldn't understand.

She would testify that she, too, was forced out of bed, told to put on a pair of pants. She would testify that the gunman then opened a drawer next to her bed and removed a watch that she had placed there.

She would testify that she then began to worry about [C.N.], whose bedroom was right next to hers. She would testify that she was then led out of the room at gunpoint towards her daughter, Elle, and son-in-law, Jonatan's room.

She would testify as she did so, she looked into [C.N.]'s room to check on her, but [C.N.] was not there.

[E]vidence would also indicate that [C.N.] was asleep in her room. She was, too, awokened [sic] by a gunman, a third gunman. Again, I don't know if this was the gunman from the basement, but it was a third individual in the house with a gun.

[C.N.] was awoken and forced out of her bed. [C.N.] was marched . . . at gunpoint into her parents' bedroom. At this point [C.N.] was told to wake up her parents.

3

You would hear evidence . . . by way of testimony from Emily and Jonatan, that they then heard their 12-year-old daughter [C.N.] begging them to wake up and crying. As they awoke, they saw the gunman with a gun pointed at their daughter's head.

They sat up in bed . . . . At this point [C.N.] was put on the ground on the bed side next to her father. The other two, Emily and Jonatan, were ordered at that point to tell them where the safe was.

Emily and Jonatan just began to start yelling things about jewelry that was laying out, wallets that were laying out, directing their captor at that point to anything that they could see of value for him to take.

The captor specifically asked for a safe, acknowledging he knew there was a safe in the house despite Jonatan's initial attempt to deny that. At that point . . . Emily was marched into the closet to open the safe.

Emily would testify that whether it be nerves or eyesight or the fact that it was dark, she wasn't able to do so.

So then Jonatan was marched into the closet and Jonatan, too, was forced to open that safe.

Your Honor, I did leave out a critical point, and that is this: When the two awoke in bed and watched this gunman with a gun to 12-year-old [C.N.]'s head, the gunman threatened that if they didn't obey his orders, that 12-year-old [C.N.] would be shot and killed. At this point . . . the safe was emptied.

You would . . . hear evidence that Jonatan Nadav at that point had a significant amount of jewelry in that safe as well as cash. . . . close to $50,000 worth of cash.

He was, by the way, a store owner. I believe he owns more than one . . . store in Philadelphia for clothing. Emily, Jonatan and Manya were all placed in the closet. They were told not to call the police or they would be killed. [T]hey remained there in the closet for several seconds until Emily did, in fact, call the police.

[O]ne of the individuals who had been on the second floor in the Nadav's bedroom went back downstairs to Elle's bedroom, retrieved the third gunman who had been there the entire time with Elle Nadav.

And Elle would say that it was approximately 20 minutes that that encounter took place. He told the third gunman who was with Elle Nadav that they were done and they could go.

4

They then, however, turned to Elle and told her that if the police were called, the entire family would be killed. They named the third sister . . . by name. They told Elle they knew where she went to college, and listed the college that she went to. They told Elle they knew the type of vehicle that she drove and actually stated what the type of vehicle she drove was.

[A]ll in all there was . . . over $40,000 worth of cash, a number of expensive jewelry pieces including, I believe, six carat diamond engagement ring and wedding ring, purses and luggage, a number of items, all in all totaling approximately $300,000. . . . By way of a property receipt it is $305,976.

\*\*\*

[The Defendant] returned to Philadelphia in the vehicle with his co-defendants.

At that point . . . he did go directly to his girlfriend's home in Philadelphia, and that was an individual by the name of Marlon Burton. He woke Marlon Burton up, she would say approximately 3:00, 3:30 in the morning. The two then went to five separate locations and utilized credit cards that had been stolen from the Nadav household.

To be clear, the [D]efendant indicated they weren't his, but didn't indicate, at that point, at least, that they had come from a home invasion that just occurred. After that they returned to Miss Burton's home where the [D]efendant removed a check from the wallet that he had stolen as well.

The check he then wrote to Marlon Burton in the amount of $5,500.

N.T. 1/24/19, at 99-110.

The morning after the offenses were committed, the Defendant and Jones exchanged text messages. N.T. 1/24/19, at 128. In text messages exchanged between the Defendant and Jones, the Defendant made reference to a Rolex watch which had been taken during the course of the robbery. In describing the text message exchange, the prosecuting attorney stated,

Defendant Sadeem [sic] Jones asked this defendant, Raymond Daniels, "You still up, bro?" There is a emoji or a little symbol of a money bag and an arm making a muscle following that question. This defendant responds, "Yeah." Sadeem [sic] Jones then indicates, "I'm excited as shit, bro." This defendant responds, "Me, too, man. That watch worth 34 grand online."

5

N.T. 1/24/19, at 135-136.

In another text message exchange, the Defendant discussed the status of the police investigation with Davis. In that exchange, Davis told the Defendant, "They got ya number. They just DNT know who you are." The Defendant advised Davis that he had changed his telephone number using an "app" and instructed Davis how to use the app to change his number. N.T. 1/24/19, at 130-132.

Of the more than $300,000 of stolen property, only one item was recovered. That item, a piece of luggage, was found in the Defendant's home. N.T. 1/24/19, at 129-130.

On November 7, 2018 and December 19, 2018, the Honorable Raymond F. McHugh, heard pretrial motions relating to all three defendants. On January 14, 2019, Judge McHugh entered an order along with finding of fact and conclusions of law wherein he denied the defendants' motions to suppress evidence and motions to sever the cases. Judge McHugh granted the motions to sever the charge of Possession of a Firearm Prohibited, 18 Pa.C.S. §6105(a)(1), filed by the Defendant and Jones.

Thereafter, the Commonwealth filed notice of its intent to invoke the ten-year mandatory minimum sentences pursuant to 42 Pa.C.S. §9714 for second and subsequent convictions for a crime of violence upon the Defendant's conviction for Robbery in violation of 18 Pa.C.S. §3701(a)(1)(ii), Robbery in violation of 18 Pa.C.S. §3701(a)(1)(iii), Burglary in violation of 18 Pa.C.S. §3502(a)(1)(i), and/or Criminal Conspiracy to commit Robbery and/or Burglary in violation of 18 Pa.C.S. §903.

On January 21, 2019, the day before trial was to commence, the Defendant called Commonwealth witness Marlon Burton, his former girlfriend and a co-defendant with regard to the Access Device Fraud charge. During that conversation, the Defendant advised Ms. Burton that

6

he had entered a guilty plea. Ms. Burton asked the Defendant if that meant she did not have to appear for trial. The Defendant responded, "That's right. That's the only reason I did it." N.T. 1/24/19, at 123-124.

On January 22, 2019, the jury selection began.

On January 24, 2019, the Defendant entered a guilty plea to the following criminal offenses:

> Robbery (threatening another with/intentionally putting Jonatan Nadav and/or Emily Nadav and/or Elle Nadav and/or C.N. and/or Manya Gurevich in fear of serious bodily injury), 18 Pa.C.S. §3701(a)(1)(ii), a felony of the first degree;

> Robbery (threatening to commit a felony of the first or second degree), 18 Pa.C.S. §3701(a)(1)(iii), a felony of the first degree;

> Robbery (inflicting, threaten with or intentionally put in fear of immediate serious bodily injury), 18 Pa.C.S. §3701(a)(1)(iv), a felony of the second degree;

> Burglary (overnight accommodation, person present, and commits, attempts, threatens to commit a bodily injury crime), 18 Pa.C.S. §3502(a)(1)(i), a felony of the first degree;

> Criminal Conspiracy to commit Robbery, Burglary and related offenses, 18 Pa.C.S. §903;

> Possession of a Firearm Prohibited, 18 Pa.C.S. §6105(a)(1), a felony of the first degree; [2]

> Criminal Trespass (breaking into occupied structure), 18 Pa.C.S. §3503(a)(1)(ii), a felony of the second degree;

> Theft by Unlawful Taking (firearm, jewelry, credit cards, currency and other property), 18 Pa.C.S. §3921(a), a felony of the second degree;

---

[2] The Defendant has a prior conviction for Robbery in violation of 18 Pa.C.S. §3701(a)(1)(ii) (inflicting or threatening another with or intentionally putting another in fear of immediate serious bodily injury), an enumerated offense under 18 Pa.C.S. §6105(b) (Persons Not to Possess Firearms). Exhibit C-1; N.T. 1/24/19, at 98-99.

Theft by Extortion (threatening to inflict harm), 18 Pa.C.S. §3923(a)(7), a felony of the second degree;

Receiving Stolen Property (firearm, jewelry, credit cards, currency and other property), 18 Pa.C.S. §3925(a), a felony of the second degree;

False Imprisonment of a Minor (by a person not a parent), 18 Pa.C.S. § 2903(b), a felony of the second degree;

False Imprisonment, 18 Pa.C.S. §2903(a), a misdemeanor of the second degree;

Criminal Coercion (threat to commit a felony/act with felonious intent), 18 Pa.C.S. §2906(a)(1), a misdemeanor of the first degree;

Terroristic Threats (threat to commit crime of violence), 18 Pa.C.S. §2706(a)(1), a misdemeanor of the first degree;

Unlawful Restraint of Minor (by a person not a parent/risk of serious bodily injury), 18 Pa.C.S. §2902(b)(1), a felony of the second degree;

Recklessly Endangering Another Person (Jonatan Nadav and/or Emily Nadav and/or Elle Nadav and/or C.N. (a minor) and/or Manya Gurevich), 18 Pa.C.S. §2705, a misdemeanor of the second degree;

Simple Assault by Physical Menace (Jonatan Nadav), 18 Pa.C.S. §2701(a)(3), a misdemeanor of the second degree;

Simple Assault by Physical Menace (Emily Nadav), 18 Pa.C.S. §2701(a)(3), a misdemeanor of the second degree;

Simple Assault by Physical Menace (Elle Nadav), 18 Pa.C.S. §2701(a)(3), a misdemeanor of the second degree;

Simple Assault by Physical Menace (C.N.), 18 Pa.C.S. §2701(a)(3), a misdemeanor of the second degree;

Simple Assault by Physical Menace (Manya Gurevich), 18 Pa.C.S. §2701(a)(3), a misdemeanor of the second degree;

Access Device Fraud, 18 Pa.C.S. §4106(a)(1)(i), a felony of the third degree.

Prior to sentence being imposed, this Court was advised that the Defendant was adjudicated delinquent in 2009 for Possessing Instruments of Crime and for Firearms not to be carried without a License. In 2012, he was adjudicated delinquent for Retail Theft. On July 6, 2011, he entered a negotiated guilty plea pursuant to which the Commonwealth agreed not to invoke the applicable five-year mandatory minimum. N.T. 1/24/19, at 121-122. The Defendant plead guilty to Robbery – threatens/intentionally puts another in fear of immediate serious bodily injury, a felony of the first degree, in violation of 18 Pa.C.S. §3701(a)(1)(ii), Criminal Conspiracy to commit Robbery – inflicting serious bodily injury, a felony of the first degree in violation of 18 Pa.C.S. §903(a)(1), and Possessing Instruments of Crime, a misdemeanor of the first degree, in violation of 18 Pa.C.S. §907(a) and was sentenced to two and a-half to six years on each count, said sentences to run concurrent with one another. Exhibit C-1. The facts underlying those convictions were summarized as follows:

> On July 11 of 2010, at approximately 10:40, the defendant, along with another individual, approached the victim, Dennis Williams, on the street in the area of 2115 West Stella -- S T E L L A -- Street in Philadelphia.

> The defendant and his co-defendant were both armed with a firearm. The defendant and his co-defendant approached the victim and demanded him to, quote, give up everything. The victim then handed over his wallet and keys and either the defendant or the co-defendant -- it is unclear from the reports, Your Honor -- then took from the waistband of the victim a .40 caliber Smith and Wesson handgun.

> On July 15 of 2010, officers of the Philadelphia Police Department were called to a location on Van Pelt Street -- V A N P E L T -- Street. They responded there for [an unrelated matter]. When they responded, the defendant was in the location and they recovered under a cushion at that location the stolen firearm from the July 11, 2010, incident.

N.T. 1/24/19, at 117-118. At the conclusion of the sentencing hearing, the Defendant was sentenced to an aggregate term of incarceration of forty to eighty years.

On February 1, 2019, the Defendant filed a motion for reconsideration of sentence. On May 23, 2019, a hearing was held. At the conclusion of the hearing, the original sentence was vacated and the Defendant was resentenced to an aggregate term of incarceration of thirty to sixty years. For the armed robbery of Jonatan Nadav, Emily Nadav, Elle Nadav, C.N. and Manya Gurevich (count 1), the Defendant was sentenced to the mandatory minimum sentence of ten to twenty years incarceration. For the crime of Burglary (count 10), the Defendant was sentenced to the mandatory minimum sentence of ten to twenty years incarceration. For the crime of Criminal Conspiracy to commit Robbery and Burglary (count 2), the Defendant was sentenced to the mandatory minimum sentence of ten to twenty years incarceration. These sentences were imposed to run consecutive to one another for an aggregate term of incarceration of thirty to sixty years. For the crime of Possession of a Firearm Prohibited (count 9), the Defendant was sentenced to five to ten years incarceration. For the crime of False Imprisonment of a Minor, C.N., (count 16), the Defendant was sentenced to five to ten years incarceration. For the crime of False Imprisonment of Jonatan Nadav, Emily Nadav, Elle Nadav and Manya Gurevich (count 24), the Defendant was sentenced to one to two years incarceration. For the crimes of Simple Assault of Jonatan Nadav, Emily Nadav, Elle Nadav, C.N., and Manya Gurevich (counts 30-34), the Defendant was sentenced to one to two years incarceration on each count. For the crime of Access Device Fraud (count 18), the Defendant was sentenced to one to two years incarceration. These sentences were all imposed to run concurrent to the sentence imposed on the Robbery conviction. No further penalty was imposed on the remaining ten counts. Restitution was ordered in the amount of

10

$305,976.00 (joint and several). The Defendant was determined not to be an eligible offender under the Recidivism Risk Reduction Incentive Act, 61 §4501 *et seq.* N.T. 5/23/19, at 71-73.

On May 23, 2019, new counsel was appointed to represent the Defendant for purposes of direct appeal. On May 29, 2019, the Defendant filed notice of appeal. By order dated June 14, 2019, the Defendant was directed to file a Concise Statement of Errors Complained of on Appeal (Statement) within twenty-one days of the entry of that order. On June 27, 2019, the Defendant filed a timely Statement.

The Defendant challenges the discretionary aspects of sentence. The standards for evaluating challenges to the discretionary aspects of sentence are well settled. "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." Commonwealth v. Bullock, 170 A.3d 1109, 1123 (Pa.Super. 2017) (quotation marks and citations omitted). A mere "error in judgment" does not constitute an abuse of discretion. Id. "Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." Id.

The Sentencing Code requires that, when imposing a sentence, a court must consider the protection of the public, the gravity of the offense as it relates to the impact on the victim and the community, the defendant's rehabilitative needs and the sentencing guidelines. 42 Pa.C.S. §9721(b). A sentencing court must also "make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed." Id. However, although the record as a whole must reflect due consideration of the statutory factors, a sentencing court "is not required to parrot the words of the Sentencing Code, stating every factor that must be considered under 9721(b)." Commonwealth v. Bullock, 170 A.3d at 1126 (quotation

11

marks and citation omitted). Rather, the record as a whole must reflect the sentencing court's consideration of the facts of the case and the defendant's character. Commonwealth v. Crump, 995 A.2d 1280, 1283 (Pa.Super. 2010). "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." Commonwealth v. Griffin, 804 A.2d 1, 10 (Pa.Super. 2002).

In imposing sentence, this Court considered all of the factors set forth in the Sentencing Code including the protection of the public, the gravity of the offense, the history, character, condition and rehabilitative needs of the Defendant and the sentencing guidelines and concluded that a very substantial term of incarceration was required. N.T. 1/24/19, at 176-178, 205. As this Court noted at the time sentence was imposed, the mandatory sentencing provisions of the Sentencing Code required imposition of three ten-year mandatory minimum sentences. These mandatory sentences were reflected in the sentencing guidelines. The guidelines for the crimes of Possession of a Firearm Prohibited, Recklessly Endangering Another Person and Simple Assault called for the maximum sentence allowable by law in the standard range. N.T. 1/24/19, at 176-178. In fashioning the sentence, this Court concluded that the offenses to which the Defendant pled guilty were separate criminal offenses for which separate sentences could be imposed.

In analyzing those offenses, this Court noted that although there was only one count of robbery, five separate robberies occurred. N.T. 1/24/19, at 198. The Court also noted that the Burglary charge only required the presence of one person at the time the offense was committed, but here, five people were present, three generations of a family that included a minor and a senior. N.T. 1/24/19, at 186. This Court also found the nature of the Criminal Conspiracy to be of significance, noting that the Criminal Conspiracy the Defendant entered involved not just one

12

criminal objective but multiple criminal objectives and that the objectives of that conspiracy were particularly violent and dangerous. N.T. 1/24/19, at 199-200.

In considering the nature of the offenses, this Court noted that this home invasion robbery was a sophisticated operation which required substantial preplanning and preparation. The conspirators scouted the location, chose to strike at 2:00 a.m. (a time when the occupants would be most easily located and at their most vulnerable), outfitted themselves with dark clothing, gloves, and masks and quietly and efficiently gained entry. Each conspirator was armed and proceeded immediately to a predesignated location in the home to effectively and efficiently isolate and control the five people in the household. N.T. 1/24/19, at 178-181.

The force utilized was extreme. The conspirators threatened the lives of each family member and demonstrated by the use of their handguns that they had the means to carry out those threats. Each member of the family was victimized in a different location in the home by different perpetrators who utilized different means. The twenty-five year old daughter awoke to find two armed men in her bedroom. Those gunmen placed the barrels of their weapons against her forehead before they put her on the floor and bound her wrists. She was held captive in her bedroom throughout the incident. One of the gunmen then took her wallet and cell phone. Before the perpetrators left the residence, this daughter was told that if she called the police, the family would be killed. This threat included another sister who was not living at the residence. To demonstrate the seriousness of the threat, the conspirators identified the sister by name and accurately identified where she attended college and the type of vehicle she drove. The grandmother also awoke to find a gunman in her bedroom who immediately began to scream at her. She was forcibly removed her from her bedroom at gunpoint and was taken to the bedroom of Jonatan and Emily Nadav. The gunman holding the grandmother at gunpoint, stole a watch

13

from the drawer of a bedside table. The twelve-year-old daughter also awoke to find a gunman in her bedroom. She was also removed from her bedroom at gunpoint and taken to her parents' bedroom. Finally, the parents awoke to find a gunman pointing a gun at their twelve-year-old daughter's head. That gunman threatened to shoot the child if the parents did not comply with his demands. After the safe was opened and the items of value were removed, the family was put in the closet and was instructed not to call the police. They were told if they called the police, they would be killed. N.T. 1/24/19, at 178-185,192 -194, 201.

This Court also discussed how the nature of the offenses reflected on the Defendant's character and his amenability to rehabilitation. N.T. 1/24/19, at 183-185. This Court specifically noted that, despite the extreme violence and apparent raw fear and emotional trauma inflicted, the Defendant's emotional response was not one of remorse or regret. Rather, he expressed "glee" and "excitement" following these horrific events. N.T. 1/24/19, at 185-186, 192. This Court also took into account the nature of the individuals with whom the Defendant chose to conspire, noting that the Defendant was aware of their violent character and still made a conscious decision to participate. This Court also noted that, given the number of conspirators, their violent tendencies, the fact that they were all armed, and the unpredictability of victims' responses to their physical incursion, the Defendant knew or should have known that there was a substantial risk that the situation could have gotten out of control and someone could have died or have been seriously injured. N.T. 1/24/19, at 183, 200.

In imposing sentence, this Court also considered the substantial impact violent home invasions by multiple armed and masked subjects have on the victims and the community. N.T. 1/24/19, at 195-197. This Court also took into account that the Defendant had a chance to ameliorate the impact these crimes had on the victims and the community by cooperating with

14

police so as to assist in the prosecution of the individuals identified as having participated in the crimes as well as identifying those who have not been identified and who remain at large. The Defendant's cooperation could have significantly decreased the fear the victims and the community were experiencing. This Court found the Defendant's unwillingness to mitigate the damage he caused to be a relevant factor in considering his amenability to rehabilitation and in evaluating whether his statements of remorse were sincere. This Court found that his decision demonstrated a lack of concern for the safety of the victims, a lack of concern for the safety of his girlfriend – a cooperating witness – and a lack of concern for the safety of the community. This Court therefore found his statements of remorse to be hollow and amenability to rehabilitation to be lacking. N.T. 1/24/19, at 187-189; N.T. 5/23/19, at 58.

In considering the Defendant's history, character, condition and rehabilitative needs, this Court found that, despite the intervention of both the juvenile and adult criminal justice system, the Defendant's criminally violent behavior had escalated from Possessing Instruments of Crime and for Firearms not to be carried without a License, to armed Robbery involving one accomplice, and finally to armed home invasion Robbery involving multiple actors and multiple victims. N.T. 1/24/19, at 186, 192. In light of this escalation, this Court concluded that the sentence imposed was necessary to prevent the Defendant from engaging in future acts of violence. N.T. 1/24/19, at 205.

In imposing sentence, this Court considered all of the factors set forth in the Sentencing Code including the protection of the public, the gravity of the offense, the history, character, condition and rehabilitative needs of the Defendant, the applicable mandatory sentences and the sentencing guidelines. This Court's decision was based on the evidence presented without partiality, prejudice, bias or ill will. The reasons for the sentence were placed on the record as

15

required. There is therefore no basis to conclude that the sentence imposed constituted an abuse of discretion or was otherwise "excessive."

The Defendant argues that "[t]he sentence was excessive considering [the Defendant]'s remorse, guilty plea and adjustment following parole." Statement, ¶ 1. He argues that "[s]entencing [the Defendant] consecutively raised the aggregate sentence to, what appears upon its face to be an excessive level considering [the Defendant]'s background and criminal conduct at issue in this case." Statement, ¶ 2. It is well-settled that a claim that a court did not weigh the factors as a defendant might wish is not sufficient to support a claim for appellate relief. Commonwealth v. Zirkle, 107 A.3d 127, 133 (Pa.Super. 2014) ("[W]e have held that a claim that a court did not weigh the factors as an appellant wishes does not raise a substantial question."). The Defendant is therefore not entitled to relief based on the assertion that more weight should have been given to the factors cited by the Defendant.

With regard to the issue of consecutive sentences, it is well-settled that a bare challenge that the trial court erred in imposing consecutive sentences does not raise a substantial question. Commonwealth v. Moury, 992 A.2d 162, 171-72 (Pa.Super. 2010). Only in extreme circumstances will imposition of consecutive sentences raise a substantial sentence, such as where the aggregate sentence is "unduly harsh, considering the nature of the crimes and the length of imprisonment." Id. In light of the facts and circumstances involved in this case, consecutive sentences cannot be deemed to be "unduly harsh."

The Defendant next argues that this Court failed to consider the Defendant's "remorse, guilty plea and adjustment following parole," his "background and criminal conduct," his "rehabilitative needs," his "adjustment to the community upon release from a state sentence completed in 2014, his strong family background and employment," and the fact that he "entered

16

a guilty plea." Statement, ¶¶ 1-4, 6. The Defendant's assertion that these factors were not considered is belied by the record. As explained above, this Court considered whether the Defendant was remorseful, his background and criminal conduct, and his rehabilitative needs. A review of the record also demonstrates that this Court considered his adjustment to the community following his release on his prior robbery conviction, his family relationships and his employment. N.T. 1/24/19, at 190-192. The record also reflects that this Court found the Defendant's age and the fact that the Defendant entered a guilty plea as a mitigating factor in his favor. N.T. 1/24/19, at 195; N.T. 5/23/19, at 70. This Court also found the evidence presented at the reconsideration hearing regarding the Defendant's relationship with his mother and his training education and employment as a dental technician to be of mitigating value. N.T. 5/23/19, at 70. As stated above, the fact that this Court may not have weighed the factors as the Defendant might wished is not a sufficient basis to warrant relief.

Finally, the Defendant claims that "[t]he court erred in conditioning the length of [the Defendant]'s sentence upon his ability and/or willingness to implicate his co-defendants." Statement, ¶ 5. The sole basis for objecting to consideration of the Defendant's lack of cooperation was that "there could be other reasons for his failure to disclose."[3] N.T. 1/24/19, at 133. This claim lacks merit. That there may be alternative explanation for a person's conduct is not a basis to exclude relevant evidence. Moreover, the Defendant had the opportunity to present evidence regarding his reasons and, in fact, did so. The Defendant testified that he chose not to provide information about the crime of the individuals involved in its commission because he was "scared for [his] family's life" and that he didn't want them to have to "watch over their shoulder's"

---

[3] The Defendant offered no other legal basis to support this claim at the time of sentencing, in his motion for reconsideration of sentence or in his Statement. The Defendant may not now raise a new theory to support his objection. Commonwealth v. Duffy, 832 A.2d 1132, 1136 (Pa.Super. 2003).

17

because of what he did in a courtroom. N.T. 1/24/19, at 164. The Defendant stated that he did not want to put them in "harm's way" when he would not "be there to protect them...." N.T. 1/24/19, at 165. This Court considered this testimony but did not find the Defendant's explanation of sufficient weight to overcome other considerations. Specifically, this Court noted that, while his cooperation would have been a mitigating factor for purposes of sentencing, his refusal to provide any information regarding the crimes or those involved in their commission and his reason for that decision was relevant and admissible to establish the dangerous nature of those with whom he chose to conspire, the degree of his professed remorse, the degree to which he was willing to accept responsibility and his rehabilitative needs. N.T. 1/24/19, at 132-135, 194-195, 212-213; N.T. 5/23/19, at 58. Since the "other reasons" were presented and properly considered, the Defendant suffered no prejudice as a result of this Court's ruling.

For the reasons set forth above, this Court finds the Defendant's claims to be without merit.

BY THE COURT:

9-6-19
**Date**

DIANE E. GIBBONS, J.

18

Antonetta Stancu, Chief Deputy District Attorney
Bucks County District Attorney's Office
100 N. Main Street
Doylestown PA 18901

Wm. Craig Penglase, Esquire
18 North Main Street, Suite 100
Doylestown PA 18901